132 F.3d 272
 NATIONAL RIFLE ASSOCIATION OF AMERICA, a New York
not-for-profit corporation; Michigan United Conservation
Clubs, a Michigan non-profit corporation; Olympic Arms, a
Washington corporation; Calico Light Weapons Systems, a
California corporation; D.C. Engineering, Inc., a Michigan
corporation; Ammo Dump, a Michigan corporation; Glenn
Duncan; Charles Duncan; James E. Flynn; James J. Fotis;
and Craig D. Sandler, Plaintiffs-Appellants,
Navegar, Inc., a Florida corporation; Thomas L. Heritier, Plaintiffs,
v.
John W. MAGAW, Director, Bureau of Alcohol, Tobacco and
Firearms; United States of America, Defendants-Appellees.
 No. 95-2150.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 27, 1997.
Decided Nov. 21, 1997.
 
 David T. Hardy (argued and briefed), Tucson, AZ, James H. Warner (briefed), Office Of General Counsel, National Rifle Association, Fairfax, VA, for Plaintiffs-Appellants.
 Mark B. Stern (argued and briefed), Andrea Newmark, Michael Hluchaniuk, Asst. U.S. Atty., Sandra M. Schraibman, U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Defendants-Appellees.
 Before: CONTIE, RYAN, and BOGGS, Circuit Judges.
 CONTIE, J. , delivered the opinion of the court, in which BOGGS, J., joined. RYAN, J. (pp. 295-298), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 CONTIE, Circuit Judge.
 
 
 1
 This case presents a pre-enforcement challenge to the constitutionality of Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, 108 Stat. 1796 (1994) (the "Crime Control Act" or "the Act"). Two non-profit gun rights associations, three firearms manufacturers, one manufacturer of ammunition feeding devices, two federally licensed firearms dealers, and five individual plaintiffs originally sought declaratory and injunctive relief under the Declaratory Judgment Act, alleging that portions of the statute were unconstitutional. The defendants are John Magaw, the director of the Bureau of Alcohol, Tobacco, and Firearms ("BATF"), and the United States of America.
 
 
 2
 In a first amended complaint filed in June 1995, plaintiffs sought a declaratory judgment that certain provisions of the Act exceeded Congress' power under the Commerce Clause, violated the Equal Protection Clause of the Fourteenth Amendment, and were vague in violation of the Due Process Clause of the Fifth Amendment. Plaintiffs also sought an injunction preventing enforcement of the provisions of the statute alleged to be unconstitutional. The United States filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that the complaint did not set forth a justiciable "case or controversy," as required by Article III of the United States Constitution. Defendants argued that plaintiffs did not have standing to sue because they had not alleged an actual or imminent injury, and that the suit was not ripe for adjudication because there was no pending or impending criminal prosecution of any plaintiff based on the criminal provisions being challenged. The district court granted defendants' motion and dismissed the action on standing and ripeness grounds. National Rifle Ass'n of America v. Magaw, 909 F.Supp. 490 (E.D. Mich. 1995). Eleven plaintiffs-appellants (hereinafter, "plaintiffs") filed a timely notice of appeal.[1]
 
 
 3
 For the following reasons, we affirm in part and reverse in part.
 
 I. The Crime Control Act
 
 4
 The Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921-930 (the "GCA"), imposes a comprehensive regulatory scheme on the manufacture and distribution of firearms. On September 13, 1994, Congress passed the Crime Control Act, which amends the GCA. It prohibits, for a period of ten years, the manufacture, transfer, or possession of semiautomatic assault weapons and the transfer or possession of large capacity ammunition feeding devices. 18 U.S.C. §§ 922(v)(1), 922(w)(1). The term "semiautomatic assault weapon" is defined as any of the firearms known by nine categories of specified brand names or model numbers.[2] 18 U.S.C. § 921(a)(30)(A). Another section of the Act defines the prohibited firearms by generic features, including semiautomatic rifles that have "an ability to accept a detachable magazine" and have at least two of five other specified characteristics. 18 U.S.C. § 921(a)(30)(B). The Act exempts certain weapons from its prohibitions, as listed in § 922, Appendix A, and described in § 922(v)(3). In section 922(w)(1) of the Act, the transfer or possession of any "large capacity ammunition feeding device" is outlawed for a period of ten years. Section 921(a)(31)(A) defines such a device to include ammunition magazines manufactured after the date of the enactment of the Act, which can hold more than ten rounds of ammunition.[3]
 
 
 5
 The statute contains various exceptions to the general prohibitions, including a "grandfather" provision that permits the possession or transfer of semiautomatic assault weapons and large capacity ammunition feeding devices that were lawfully possessed on the date of enactment. 18 U.S.C. §§ 922(v)(2), 922(w)(2). Persons convicted of knowingly violating these provisions of the Act are subject to fines and prison sentences of up to five years. 18 U.S.C. § 924(a)(1).
 
 
 6
 Prior to passage of the Act, the BATF, a division of the Treasury Department, sent a letter on September 6, 1994, to all federally licensed firearms manufacturers, advising them of the statute's prohibitions and exemptions. The Act became effective on September 13, 1994. Following passage of the Act, the BATF sent a subsequent letter on September 26, 1994, advising manufacturers that certain component parts lawfully possessed on or before September 13, 1994 were not "grandfathered" under the law and could not be assembled into a complete semiautomatic assault weapon for sale in ordinary commercial channels. The letter informed the manufacturers that BATF inspectors would conduct a final inventory of their semiautomatic assault weapons to determine the number lawfully possessed on the date of enactment of the Act.
 
 
 7
 The eleven plaintiffs-appellants who bring this appeal may be divided into several categories. The federally licensed corporations--D.C. Engineering, Inc., Olympic Arms, Inc., and Calico Light Weapons Systems, Inc.--manufacture firearms or ammunition feeding devices. The firearms dealers, Ammo Dump and Glenn Duncan, hold a federal firearms license and conduct a firearms business in the sale and repair of weapons. We will designate the manufacturers and firearm dealers as the Group I plaintiffs. A second group consists of the individual plaintiffs--Charles Duncan, James E. Flynn, James J. Fotis, and Craig D. Sandler, who wish to possess prohibited products (Group II plaintiffs). We will designate as the third group the nonprofit gun rights associations, the National Rifle Association ("NRA") and Michigan United Conservation Clubs ("MUCC"), whose members wish to own, possess, and transfer firearms prohibited by the statute (Group III plaintiffs). Because we believe that each group of plaintiffs presents different concerns in regard to the doctrines of standing and ripeness, we will treat each group separately.[4]
 
 
 8
 Plaintiffs' complaint specifically alleged that the definitions of "semiautomatic assault weapon" contained in §§ 921(a)(30)(A), (B) of the Act were unconstitutionally vague and denied them due process of law (Counts I, II, and VI); that Congress exceeded the scope of its constitutional power under the Commerce Clause by enacting the prohibitions in §§ 922(v)(1), 922(w)(1) of the Act (Count III); that the ban on certain semiautomatic assault weapons, as designated in § 921(a)(30), and the protection of others, as designated in § 922(v)(3) and § 922, Appendix A, was arbitrary and capricious, violating the Equal Protection Clause (Count IV), and was not rationally related to any legitimate federal interest (Count VII); and that BATF's interpretation of the terms "frame" and "receiver" in § 921(a)(3)(B) for purposes of the grandfather provision at § 922(v)(2) was arbitrary and capricious (Count V).[5] The district court found that plaintiffs' complaint did not present a justiciable "case or controversy" as required by Article III of the Constitution.
 
 II. Justiciability Requirements
 
 9
 We review issues of justiciability pursuant to Article III de novo. Kelley v. Selin, 42 F.3d 1501, 1507 (6th Cir.), cert. denied, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995).
 
 
 10
 Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." U.S. Const. art. III, § 2. The threshold question in every federal case is whether the court has the judicial power to entertain the suit. Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975). Federal judicial power is limited to those disputes "which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). As the Supreme Court explained in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471-76, 102 S.Ct. 752, 757-61, 70 L.Ed.2d 700 (1982), the "case or controversy" requirement defines, with respect to the Judicial Branch, the idea of separation of powers on which the Federal Government is founded. In an attempt to give meaning to Article III's "case or controversy" requirement, the courts have developed a series of principles termed "justiciability doctrines." The Article III doctrine that requires a litigant to have "standing" to invoke the jurisdiction of a federal court is perhaps the most important. Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Article III standing requires a litigant to have suffered an injury-in-fact, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief. Id. at 751, 104 S.Ct. at 3324-25; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992); Linton by Arnold v. Commissioner of Health and Environment, State of Tennessee, 973 F.2d 1311, 1316 (6th Cir.1992).
 
 
 11
 In the present case, plaintiffs bring suit under the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides the mechanism for seeking pre-enforcement review of a statute.[6] Declaratory judgments are typically sought before a completed "injury-in-fact" has occurred, Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 (3rd Cir.), cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), but must be limited to the resolution of an "actual controversy." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937). When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review. See Bras v. California Pub. Utilities Comm'n, 59 F.3d 869, 873 (9th Cir.1995), cert. denied, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996). Although in regard to criminal statutes, courts are wary of compromising the public interest in efficient law enforcement by intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties when there is a great and immediate danger of irreparable loss. Watson v. Buck, 313 U.S. 387, 400, 61 S.Ct. 962, 966, 85 L.Ed. 1416 (1941). As the court in Minnesota Citizens Concerned for Life v. Federal Election Comm'n, 113 F.3d 129, 132 (8th Cir.1997), indicated, pre-enforcement review is usually granted under the Declaratory Judgment Act when a statute "imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity."
 
 
 12
 The existence of an "actual controversy" in a constitutional sense is necessary to sustain jurisdiction under the Declaratory Judgment Act. Aetna Life Ins. Co., 300 U.S. at 239-40, 57 S.Ct. at 463-64; Muller v. Olin Mathieson Chemical Corp., 404 F.2d 501, 503 (2nd Cir.1968). The Supreme Court has explained that an actual controversy in this sense is one that is appropriate for judicial determination, stating:
 
 
 13
 A justiciable controversy is ... distinguished from a difference or dispute of a hypothetical or abstract character, from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised [under the Act]....
 
 
 14
 Aetna Life Ins. Co., 300 U.S. at 240-41, 57 S.Ct. at 464 (citations omitted). To determine whether a plaintiff has standing to adjudicate an "actual controversy," requisite for relief under the Declaratory Judgment Act, one must ask whether the parties have "adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" even though the injury-in-fact has not yet been completed. Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959-60, 22 L.Ed.2d 113 (1969); Michigan State Chamber of Commerce v. Austin, 788 F.2d 1178, 1181 (6th Cir.1986).
 
 
 15
 A second doctrine that "cluster[s] about Article III" is ripeness. Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (D.C.Cir.1982) (Bork, J., concurring), cert. denied, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). Ripeness requires that the "injury in fact be certainly impending." National Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C.Cir.1996). Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review. Abbott Laboratories v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977) (hereinafter, "Abbott Labs.").
 
 
 16
 Third, the Supreme Court has stressed that the alleged injury must be legally and judicially cognizable, Raines v. Byrd, 521 U.S. 811, ----, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997), and that the issues must be fit for judicial resolution. This requires that the plaintiff have suffered "an invasion of a legally protected interest," Lujan, 504 U.S. at 560, 112 S.Ct. at 2136, which is "traditionally thought to be capable of resolution through the judicial process," Flast v. Cohen, 392 U.S. at 97, 88 S.Ct. at 1951, and is currently fit for judicial review.
 
 
 17
 Thus, in order to determine whether each category of plaintiffs in the present case meets the requirements of Article III, and whether it is appropriate for a federal court to hear their pre-enforcement challenges to the Crime Control Act, this court must ask three questions: (1) whether the plaintiff has standing--whether he is the proper party to request an adjudication of a particular issue, because he has suffered a concrete injury-in-fact; (2) whether a particular challenge is brought at the proper time and is ripe for pre-enforcement review; and (3) whether the issue currently is fit for judicial decision.
 
 
 18
 III. The Manufacturers and Dealers (Group I Plaintiffs)
 
 A. Standing
 
 19
 To determine whether the manufacturers and firearms dealers have standing to challenge the constitutionality of the Crime Control Act, we must examine the nature of the injury-in-fact which they have alleged. "The injury alleged must be ... 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.' " Allen v. Wright, 468 U.S. at 751, 104 S.Ct. at 3324 (citations omitted). The Supreme Court has stated:
 
 
 20
 [T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?
 
 
 21
 Id. at 752, 104 S.Ct. at 3325. See also Lujan, 504 U.S. at 560-61, 112 S.Ct. at 2136-37.
 
 
 22
 In the present case, the manufacturers and dealers allege that passage of the Act has a significant impact on the way they conduct their businesses and indicate compliance with the prohibitions of the Act causes them immediate economic harm. Because of the ban on specific semiautomatic assault weapons and large capacity ammunition feeding devices, the manufacturing plaintiffs allege they will be forced to redesign and relabel some products and cease production of others. For example, prior to passage of the Act, plaintiffs Olympic Arms and Calico Light Weapons Systems manufactured firearms specifically prohibited by § 921(a)(30)(A) (in particular, the Colt AR-45), and D.C. Engineering manufactured large capacity ammunition feeding devices prohibited by § 921(a)(31). These plaintiffs were forced to cease manufacturing prohibited products when the statute took effect out of fear of prosecution. In order to comply with the Act, they must forego a particular line of business or redesign and relabel their products. The federally licensed firearms dealers plead that compliance with the Act affects their daily businesses by prohibiting the possession and sale of specific weapons and ammunition feeding devices. For example, plaintiff Glenn Duncan, a licensed firearms dealer and gunsmith, attests that prior to passage of the Act, he regularly sold, repaired, and modified the AR-15 firearm and others prohibited by the Act, but is now forbidden from doing so. The firearm dealers also allege that they possess component parts which they can no longer use to assemble proscribed weapons, out of fear of prosecution. In sum, the manufacturers and dealers, who must comply with the Act as a condition of functioning in an intensely regulated industry, illustrate that they have suffered economic harm from the impact of passage of the Act, which has restricted the operation of their businesses in various ways--either forcing them to "stop production," "decline work," and to "refrain from sales and marketing," or imposing the need to redesign and relabel products.
 
 
 23
 In Count Three of the complaint, the manufacturers and dealers argue that the prohibitions enacted in §§ 922(v)(1) and 922(w)(1) of the Act exceed congressional power to regulate under the Commerce Clause. In Counts Four and Seven, they contend that the prohibition against specific weapons in § 921(a)(30)(A) violates the Equal Protection Clause by banning certain firearms by brand name or model number, while permitting firearms of the same type, function, and capacity to be sold under other makers' names. They allege the statute permits the manufacture of nearly identical arms, and the prohibitions are not rationally related to any government purpose.
 
 
 24
 The precise standing issue, in regard to the manufacturers and dealers, is whether upon pleading such facts, the Group I plaintiffs may bring an Equal Protection and Commerce Clause challenge to the Act. In other words, does a manufacturer or dealer, who alleges that he is prohibited from making a product he formerly produced or sold, have standing to challenge a law that allows competitors to continue making similar products? Does a manufacturer, who alleges that he has been forced to cease production of a banned product and to redesign or relabel his products, have standing to challenge Congress' authority to regulate the product under the Commerce Clause? Based on the facts alleged by the manufacturers and dealers indicating the impact of the Act on their businesses, we believe they have demonstrated sufficient injury-in-fact to confer standing.[7]
 
 
 25
 We find that the injury-in-fact to the manufacturers and dealers created by the alleged constitutional violations in these counts of the complaint is "concrete and particularized," Lujan, 504 U.S. at 560, 112 S.Ct. at 2136, "real and immediate," Golden v. Zwickler, 394 U.S. at 108, 89 S.Ct. at 959-60, and not "abstract" or "conjectural." Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1664-65, 75 L.Ed.2d 675 (1983). There is no doubt that the effects of the prohibitions of the Act are currently felt by the manufacturers and dealers in a concrete way. The prohibitions are not hypothetical, but take effect immediately, and the court need not speculate on the kind of activity the manufacturers and dealers want to engage in--they want to continue making and selling the products specifically prohibited by name, model number, and design in certain provisions of the Act. See United Public Workers v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (threat was hypothetical as court could only speculate on kinds of political activity appellants wished to engage in). The statute inflicts a concrete commercial injury, which takes effect immediately prior to prosecution. The manufacturers' and dealers' challenges to the Act under the Commerce Clause and Equal Protection Clause are, thus, disputes brought by truly adversarial parties with a genuine stake in the outcome of the adjudication. Allen v. Wright, 468 U.S. at 770, 104 S.Ct. at 3334-35. The causal connection between the economic injury and the conduct complained of is "fairly ... trace[able] to the challenged action" of defendants. Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-26, 48 L.Ed.2d 450 (1976). The prohibitions of the Act are addressed directly to manufacturers and dealers of semiautomatic assault weapons and large capacity ammunition feeding devices, and the injury to these plaintiffs' businesses stems directly from the Act's ban of specific products by brand name, model number, and design. Finally, it is likely that the injury will be redressed by the requested relief. The manufacturers and dealers have abandoned a line of business because of passage of the Act; were the Act to be declared unconstitutional, they would promptly resume the prohibited activities.
 
 
 26
 As the court in Pic-A-State Pa., Inc., 76 F.3d at 1299, pointed out, courts have routinely found sufficient adversity between the parties to create a justiciable controversy when suit is brought by the particular plaintiff subject to the regulatory burden imposed by a statute. See also Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745-46, 35 L.Ed.2d 201 (1973) (when a criminal statute directly targets a specific profession and directly operates to restrict a person in his profession, pre-enforcement review is available). In the present case, the manufacturer and dealer plaintiffs have been targeted for regulation by the Crime Control Act and have been directly harmed by the statute's prohibitions against specific weapons and ammunition feeding devices. Thus, they are the proper parties to bring suit. In addition, this court has held that "[a]n economic injury which is traceable to the challenged action" satisfies the requirements of Article III standing. Linton, 973 F.2d at 1316. As the Supreme Court indicated in Abbott Labs., there is no question that the manufacturers and firearm dealers have sufficient standing as plaintiffs, because "the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the ... rule they are quite clearly exposed to the imposition of strong sanctions." 387 U.S. at 154, 87 S.Ct. at 1518. To conclude, the manufacturers and dealers have alleged an immediate, concrete injury-in-fact to their businesses, which is fairly traceable to the challenged prohibitions of the Act, and there is a substantial likelihood that the relief requested will redress their claimed injury. For these reasons, we find the Group I plaintiffs have met their burden of demonstrating an "actual controversy" sufficient to confer standing to adjudicate the challenges set forth in Counts Three, Four, and Seven of the complaint.[8]
 
 
 27
 Our conclusion that the manufacturers and dealers in the present case have standing to bring suit is consistent with the opinion of the Court of Appeals for the District of Columbia in Navegar, Inc. v. United States, 103 F.3d 994 (D.C.Cir.1997). There, the court found that one of the original plaintiffs herein, Navegar, Inc., had standing to challenge certain provisions of the Crime Control Act.[9] Id. at 1002. In Navegar, the appellants, Navegar, doing business as Intratec, and Penn Arms, challenged those portions of the Act that singled out for prohibition specific weapons manufactured only by them.[10] The court found that the weapon-specific nature of these provisions of the Act put the appellants in a special posture with regard to the issue of standing, stating as follows:
 
 
 28
 [T]he Act in effect singles out the appellants as its intended targets, by prohibiting weapons that only the appellants make. This fact sets this case apart from most others in which preenforcement challenges to the Act have been held nonjusticiable. It also makes the applicability of the statute to appellants' business indisputable: if these provisions of the statute are enforced at all, they will be enforced against these appellants for continuing to manufacture and sell the specified weapons....
 
 
 29
 Id. at 999. We believe the reasoning of Navegar applies in the present case. The Crime Control Act specifically targets the manufacturers and dealers herein, who make and sell the particular products prohibited in §§ 921(a)(30), (31) of the Act, and the applicability of the Act to their businesses is indisputable.
 
 
 30
 Not only have the manufacturer and dealer plaintiffs herein terminated the manufacture and sale of prohibited products and suffered economic harm in response to passage of the Act, but any further attempt to pursue prohibited lines of business risks serious criminal penalties. In circumstances such as these, we believe the Group I plaintiffs have standing to challenge the prohibitions of § 921(v)(1) and § 921(w)(1) as defined in § 921(a)(30) and § 921(a)(31) of the Act on Commerce Clause and Equal Protection grounds. See General Motors Corp. v. Tracy, 519 U.S. 278, ----, 117 S.Ct. 811, 818, 136 L.Ed.2d 761 (1997) (consumers who suffer economic injury from regulation forbidden under the Commerce Clause satisfy standing requirements of Article III); Craig v. Boren, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976) (plaintiff beer vendor had standing to challenge the constitutionality of Oklahoma statute prohibiting the sale of beer to males under the age of 21 and females under the age of 18 where vendor would either sustain economic injury or lose her license as a result of the statute's operation); Postscript Enterprises, Inc. v. Whaley, 658 F.2d 1249, 1252 (8th Cir.1981) (appellant had sustained injury-in-fact that satisfies Article III's standing requirement as the legal duties created by the ordinance were addressed directly to vendors such as appellant, who was obliged either "to heed the statutory prohibition, thereby incurring a direct economic injury through the constriction of its market, or to disobey the statutory command and suffer legal sanctions.").
 
 B. Ripeness
 
 31
 We must next decide whether the manufacturers' and dealers' challenges in Counts Three, Four, and Seven of the complaint are ripe for judicial review. The Supreme Court has stated that the basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985). Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all. Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 200-01, 103 S.Ct. 1713, 1720-21, 75 L.Ed.2d 752 (1983); Dames & Moore v. Regan, 453 U.S. 654, 689, 101 S.Ct. 2972, 2991-92, 69 L.Ed.2d 918 (1981). Ripeness is, thus, a question of timing. Regional Rail Reorganization Act Cases, 419 U.S. 102, 139, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974). A case is ripe for pre-enforcement review under the Declaratory Judgment Act only if the probability of the future event occurring is substantial and of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Golden v. Zwickler, 394 U.S. at 108, 89 S.Ct. at 959-60; Armstrong World Indus. v. Adams, 961 F.2d 405, 412 (3rd Cir.1992).
 
 
 32
 This court has stated that ripeness requires us to weigh several factors in deciding whether to address the issues presented for review. United Steelworkers, Local 2116 v. Cyclops Corp., 860 F.2d 189, 194 (6th Cir.1988). We must address the hardship to the parties if judicial relief is denied at the pre-enforcement stage in the proceedings. Id. at 195. We must examine the "likelihood that the harm alleged by plaintiffs will ever come to pass." Id. at 194. And we must consider whether the case is fit for judicial resolution at the pre-enforcement stage, which requires a determination of whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims. Id. at 195. See also Brown v. Ferro Corp., 763 F.2d 798, 801 (6th Cir.) ("ripeness doctrine ... requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances"), cert. denied, 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). As the Supreme Court has stated, the prudential considerations that weigh in the ripeness calculus are the need to "fles[h] out" the controversy and the burden on the plaintiff who must "adjust his conduct immediately." Lujan, 497 U.S. at 891, 110 S.Ct. at 3190.
 
 
 33
 In the present case, the district court found the action was not ripe for judicial review because no prosecution of any plaintiff was pending or imminent. The district court stated that a pre-enforcement challenge to a statute with criminal penalties is premature prior to enforcement unless the threat of prosecution is imminent. The district court based its analysis primarily on cases that involve challenges to statutes criminalizing the exercise of First Amendment rights, such as Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), and Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). We believe the district court erred in this regard, because the harm or injury-in-fact alleged in First Amendment cases is very different from that alleged by the manufacturers and dealers herein, and, consequently, different concerns arise when determining whether the case is ripe for judicial review.
 
 
 34
 Within the context of the First Amendment, the Supreme Court has enunciated concerns that justify a lessening of the usual prudential requirements for a pre-enforcement challenge to a statute with criminal penalties. Secretary of State of Maryland v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956, 104 S.Ct. 2839, 2846-47, 81 L.Ed.2d 786 (1984). The harm alleged in First Amendment cases is the "chilling effect" on the constitutionally protected right to free expression, which, the Supreme Court has stated, is "of transcendent value to all society." Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). A statute prohibiting activity protected by the First Amendment leads to "self-censorship, a harm that can be realized even without an actual prosecution." Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988); Dombrowski, 380 U.S. at 486-87, 85 S.Ct. at 1120-22 (the practical value of the First Amendment right may be destroyed if not vindicated before trial). The ripeness inquiry to pre-enforcement challenges in First Amendment cases usually focuses on how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute in order to ensure that the fear of prosecution is genuine and the alleged chill on First Amendment rights is concrete and credible, and not merely imaginative or speculative. Steffel v. Thompson, 415 U.S. at 459, 94 S.Ct. at 1215; Babbitt, 442 U.S. at 301-03, 99 S.Ct. at 2310-11. Parties not yet affected by the actual enforcement of the statute are allowed to challenge actions under the First Amendment in order to ensure that an overbroad statute does not act to " 'chill' the exercise of free speech and expression," a constitutionally protected right. Dambrot v. Central Michigan Univ., 55 F.3d 1177, 1182 (6th Cir.1995). More stringent requirements apply when litigants challenge a statute, such as the Crime Control Act, which does not inhibit or "chill" the expression of a constitutionally protected right, but instead imposes significant and costly compliance measures. However, contrary to the district court's contention, actual or imminent enforcement is not always a prerequisite in non-First Amendment cases, if the statute creates a "present harm," such as substantial economic injury. In order to determine whether the present case is ripe for pre-enforcement review, we believe, therefore, that we must look to cases dealing with similar economic injury for precedential guidance, and not to First Amendment cases. See Allen v. Wright, 468 U.S. at 751-52, 104 S.Ct. at 3324-25 (questions about justiciability can be answered chiefly by comparing the allegations of the particular complaint to those made in similar cases).
 
 
 35
 The seminal case regarding pre-enforcement review outside the First Amendment context is Abbott Labs., 387 U.S. at 136, 87 S.Ct. at 1507. This case involved a challenge by drug manufacturers to regulations promulgated under the Food, Drug and Cosmetic Act before the regulations had been enforced against them.[11] The Supreme Court determined that there was jurisdiction in the federal courts under the Declaratory Judgment Act and the Administrative Procedure Act for pre-enforcement review, but found that a further inquiry had to be made. "The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them ... unless [they] arise in the context of a controversy 'ripe' for judicial resolution." Id. at 148, 87 S.Ct. at 1515. The Supreme Court stated that the problem is best seen in a twofold aspect, requiring the Court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515.
 
 1. Hardship to the Parties
 
 36
 In the face of the regulations at issue in Abbott Labs., the petitioners (the pharmaceutical firms) were forced either to change all labels and promotional materials for various generic drugs or to refuse to abide by the new regulations and risk serious criminal and civil penalties for noncompliance. Id. at 152-53, 87 S.Ct. at 1517-18. The Supreme Court found that the new drug-labeling regulations had the status of law and had an immediate impact on the day-to-day operations of the petitioners' businesses, requiring substantial monetary investment in order to comply. Id. The Supreme Court reasoned that "the impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review" at the pre-enforcement stage, because promulgation of the regulations "puts petitioners in a dilemma": "Either they must comply with the [labeling] requirement and incur the costs of changing over their promotional material and labeling or they must follow their present course and risk prosecution." Id. at 152, 87 S.Ct. at 1517 (internal quotation marks omitted). The Supreme Court found that the immediate impact of the regulations on the drug manufacturers also satisfied the "hardship" prong. Id. at 153, 87 S.Ct. at 1517-18. "[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." Suitum v. Tahoe Regional Planning Agency, --- U.S. ----, ----, 117 S.Ct. 1659, 1669, 137 L.Ed.2d 980 (1997). In Abbott Labs., the hardship requirement was satisfied by the fact that the affected companies either had to expend substantial amounts of money to comply with the regulations or not comply and risk serious criminal and civil penalties.
 
 
 37
 In assessing the magnitude and immediacy of the hardship imposed by the Crime Control Act upon the manufacturers and dealers in the present case, we find that the resemblance between the facts of Abbott Labs. and those before us is striking. The manufacturers and dealers herein are faced with significant changes in the day-to-day operation of their businesses in order to comply with a statutory provision. Like the drug companies in Abbott Labs., plaintiffs, for all practical purposes, are coerced into a particular course of conduct by the prospect of heavy civil and criminal penalties that might be visited upon them. 387 U.S. at 152-53, 87 S.Ct. at 1517-18. The alleged economic harm is similar. The Group I plaintiffs must relabel and redesign products or cease production and sales of prohibited products, requiring either a substantial monetary investment or loss in order to comply. As was the case in Abbott Labs., the impact of the government action is "direct and immediate," and noncompliance risks serious civil and criminal penalties. Id. The Court in Abbott Labs. found that such a circumstance "put petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." Id. at 152, 87 S.Ct. at 1517. The Court assessed the "hardship to the parties if judicial relief were denied at the [pre-enforcement] stage in the proceedings" and concluded:
 
 
 38
 To require [petitioners] to challenge these regulations only as a defense to an action brought by the Government might harm them severely and unnecessarily.... [W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to non-compliance, access to the courts under the Administrative Procedure Act and Declaratory Judgment Act must be permitted....
 
 
 39
 Id. at 153, 87 S.Ct. at 1518.
 
 
 40
 In the present case, the hardship factor clearly weighs in the manufacturers' and dealers' favor. See Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n, 710 F.2d 1165, 1172 (6th Cir.1983) (hardship to the company of requiring it to wait to challenge proposed changes in testing "tar" and nicotine levels of manufacturer's cigarettes appears to be no less than the hardship faced by the drug companies in Abbott Labs.). The government's interest in deferral is outweighed because postponement of a decision would work substantial hardship, requiring the expenditure or loss of substantial amounts of money, which could not be recovered if the law were eventually struck down. As in the Regional Rail Reorganization Act Cases, 419 U.S. at 144, 95 S.Ct. at 359, the manufacturers' and dealers' decisions "to be made now or in the short future [will] be affected by whether or not the ... issues are now decided." The Supreme Court found that in such a circumstance, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." Id. at 143, 95 S.Ct. at 358, quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923). See also Thomas v. Union Carbide Agricultural Products Co., 473 U.S. at 581, 105 S.Ct. at 3333 (nothing would be gained by postponing a decision and to require the industry to proceed without knowing whether the arbitration scheme was valid would impose "a palpable and considerable hardship"); Pacific Gas & Electric Co., 461 U.S. at 201-02, 103 S.Ct. at 1721 (preenforcement challenge to waste disposal regulations, requiring expenditure of millions of dollars over a number of years, was permitted, because the need for judicial decision was immediate; otherwise electric utilities would be forced either to abandon all nuclear energy development or run the risk that planning and development expenses would be incurred for naught); Environmental Protection Agency v. National Crushed Stone Ass'n, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (facial challenge to the variance provision of an EPA pollution-control regulation was ripe for pre-enforcement review, because failure to review the matter would cause hardship, and resolution of the conflict would determine for some crushed stone plants whether they could continue to exist or not); Brown v. Ferro Corp., 763 F.2d at 804 (very real hardship may be caused by failure of court to consider the validity of golden parachutes at this time).
 
 
 41
 The manufacturers and firearms dealers herein present a classic example of when pre-enforcement review must be granted. Absent the availability of pre-enforcement review, these plaintiffs must either terminate a line of business, make substantial expenditures in order to comply with the Act, or willfully violate the statute and risk serious criminal penalties. Like the drug companies in Abbott Labs., these plaintiffs are "put ... in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." Id. at 152, 87 S.Ct. at 1517. The government's action would reasonably prompt a regulated industry, unwilling to risk substantial penalties by defying the statute, to undertake costly compliance measures or forego a line of business. State Farm Mutual Auto. Ins. Co. v. Dole, 802 F.2d 474, 480 (D.C.Cir.1986), cert. denied, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). Thus, the federal court is not asked to decide a case involving conjectural or hypothetical injury, but one that creates substantial economic hardship, which is direct and immediate, and will be compounded by a refusal of the court to intervene prior to enforcement of the statute.
 
 
 42
 Although we are aware of the Supreme Court's admonition "not to entertain constitutional questions in advance of the strictest necessity," Poe v. Ullman, 367 U.S. 497, 503, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989 (1961), we believe that as a policy matter, strong reasons counsel against requiring the manufacturers and dealers to engage in illegal conduct before their challenges can be heard. There are no advantages to the court to be gained from withholding judicial review at the present time and waiting until a manufacturer or dealer has been prosecuted under the Act. A defense in criminal proceedings on constitutional grounds does not provide an adequate remedy for the economic injury incurred. Abbott Labs., 387 U.S. at 153, 87 S.Ct. at 1517-18. Furthermore, we believe a citizen should be allowed to prefer "official adjudication to public disobedience." See 13A, Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 3532.5 at 183-84 (2nd ed.1984). As the court in Navegar indicated, a denial of review to the manufacturers and dealers affected by the Act would be totally unjustified by the constitutional or prudential concerns underlying the ripeness doctrine. 103 F.3d at 1001. As in Abbott Labs., the prohibitions of the Act "require an immediate and significant change in the[se] plaintiffs' conduct of their affairs with serious penalties attached to non-compliance." 387 U.S. at 153, 87 S.Ct. at 1518. To require the manufacturers and dealers to challenge the prohibitions of the Act "only as a defense to an action brought by the Government might harm them severely and unnecessarily." Id. Therefore, we find that the manufacturers' and dealers' challenges to the Act on Commerce Clause and Equal Protection grounds are ripe for review, and "access to the courts ... under the Declaratory Judgment Act must be permitted." Id.2. Well-Founded Fear of Prosecution
 
 
 43
 The United States argues that the rationale of Abbott Labs. does not apply in the present case, because in Abbott Labs., the pre-enforcement challenge was brought pursuant to the Administrative Procedure Act, which specifically provides for challenges to final agency action. We do not agree that Abbott Labs. must be construed so narrowly. One reason the Supreme Court gave for granting pre-enforcement review in Abbott Labs. was that the regulations at issue had the status of law. 387 U.S. at 152, 87 S.Ct. at 1517. Moreover, the Supreme Court has found a pre-enforcement challenge to the constitutionality of a statute with criminal penalties ripe for review pursuant to the Declaratory Judgment Act. In Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), the Supreme Court reviewed a state statute which the appellants alleged inflicted economic harm. The Supreme Court developed the "present effectiveness in fact" doctrine to address the likelihood that the harm allegedly inflicted by the regulation in the statute would come to pass. Id. at 507, 92 S.Ct. at 1755. The Court found that the appellants, a water carriers' association and individual members who owned or operated federally licensed Great Lakes cargo vessels, could bring a pre-enforcement challenge to the constitutionality of the Michigan Watercraft Pollution Control Act, which prohibited them from dumping sewage and required them to have sewage storage devices on board their vessels. Id. at 506, 92 S.Ct. at 1755.
 
 
 44
 The Court found that the question of whether the complaint presented an actual controversy ripe for review under the Declaratory Judgment Act was whether "there [was] a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." Id. The Court found that the complaint, which challenged the statute on both Commerce Clause and Equal Protection grounds, presented an actual controversy that was ripe for review, because the obligation to install the sewage storage devices under the Michigan statute was presently effective in fact, even though the appellants had not been threatened with criminal prosecution. Id. The Court stated:
 
 
 45
 They depend [for their argument that the statute is ripe for review] ... on the present effectiveness in fact of the obligation under the Michigan statute to install sewage storage devices. For if appellants are now under such an obligation, that in and of itself makes their attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion.
 
 
 46
 Id. at 507, 92 S.Ct. at 1755. As was the case in Abbott Labs., the appellants' challenges were ripe for judicial review because of the immediacy of the hardship imposed by the Michigan statute.
 
 
 47
 Thus, if appellants are to avoid prosecution, they must be prepared, according to Michigan authorities, to retain all sewage on board as soon as pump-out facilities are available, which, in turn, means that they must promptly install sewage storage devices. In this circumstance, compliance is coerced by the threat of enforcement, and the controversy is both immediate and real.
 
 
 48
 Id. at 508, 92 S.Ct. at 1756. Like the petitioners in Abbott Labs., the appellants in Lake Carriers' Ass'n were put in the untenable position of having to choose either to comply with the statute and immediately sustain an economic hardship or refuse to comply and risk future enforcement of the statute against them, which would result in severe penalties.
 
 
 49
 In Lake Carriers' Ass'n, the Supreme Court indicated that in order to establish the need for pre-enforcement review, the Court also had to determine whether compliance was "uncoerced by the risk of enforcement." Id. at 507, 92 S.Ct. at 1756. In other words, the Court had to determine if appellants' decision to challenge the obligations and prohibitions contained in the Watercraft Pollution Control Act was truly motivated by a well-founded fear that refusal to comply would lead to prosecution. The Court found that the state of Michigan had sought "on the basis of the Act and the threat of future enforcement to obtain compliance as soon as possible." Id. Therefore, the appellants' preenforcement challenge was ripe for judicial review. Id. at 506, 92 S.Ct. at 1755.
 
 
 50
 The same is true in the present case. As this court has pointed out, the Supreme Court typically has allowed pre-enforcement review when enforcement of a statute or ordinance against a particular plaintiff is inevitable. Kardules v. City of Columbus, 95 F.3d 1335, 1344 (6th Cir.1996). See also Pennell v. City of San Jose, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (landlord's challenge to rent control ordinance was ripe for pre-enforcement review as landlords had demonstrated realistic danger of sustaining a direct economic injury as a result of the ordinance's operation and future enforcement against them); Illinois v. General Electric Co., 683 F.2d 206, 210 (7th Cir.1982) ("as the Act has only one conceivable target ... it is extremely unlikely that the state would overlook the violation," and the controversy is therefore ripe), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).
 
 
 51
 In the present case, the likelihood that the Crime Control Act will be enforced against federally licensed firearm manufacturers and dealers who refuse to comply with its prohibitions is clear, as the court in Navegar found with respect to one of the original plaintiffs herein, Navegar, Inc. The court pointed out that the Act's specific prohibition of products made by appellants Navegar and Penn Arms indicated the Act's intention of eliminating this portion of their business and made the Act "present[ly] effective[ ] in fact," citing Lake Carriers' Ass'n. 103 F.3d at 1000. The court in Navegar found that the appellants' failure to comply would inevitably lead to prosecution, stating:
 
 
 52
 To conclude that the appellants face no credible threat of prosecution under these portions of the Act, we would have to believe that the government would enact a widely publicized law targeting products that only the appellants make, ... but then sit idly by while the appellants continued to manufacture the outlawed weapons. To imagine that the government would conduct itself in so chimerical a fashion would be to declare in effect that federal courts may never, in the absence of an explicit verbal "threat," decide preenforcement challenges to criminal statutes. This has never been the law. To require litigants seeking resolution of a dispute that is appropriate for adjudication in federal court to violate the law and subject themselves to criminal prosecution before their challenges may be heard would create incentives that are perverse from the perspective of law enforcement, unfair to the litigants, and totally unrelated to the constitutional or prudential concerns underlying the doctrine of justiciability.
 
 
 53
 Id. at 1000-01.
 
 
 54
 We agree with the reasoning in Navegar and find that it applies to the manufacturers and dealers in the present case. The prohibitions of the Crime Control Act are presently effective in fact, and these plaintiffs' challenges are motivated by a well-founded fear of prosecution. The applicability of the Act to their businesses is indisputable, and "compliance is coerced by the threat of enforcement." Lake Carriers' Ass'n, 406 U.S. at 507, 92 S.Ct. at 1755-56. Evidence that the government intends to enforce the Act against these plaintiffs is demonstrated by the September 1994 letters sent out by BATF, explaining the prohibitions of the Act and indicating that BATF inspectors would conduct a final inventory of semiautomatic assault weapons which fit within the exemptions. The letters indicate the government's intention to enforce the law through inspections and to prevent the manufacture and sale of prohibited products that do not fall within its exemptions. We agree with the court in Navegar that it is inconceivable that the government would enact a widely publicized law, outlawing specific products by name, model number, and design, which are manufactured and sold by specific companies and dealers, and then sit idly by if the companies continued to manufacture and the dealers continued to sell the outlawed products. 103 F.3d at 1000-01. As in Lake Carriers' Ass'n, the government in the present case has "sought through the threat of future enforcement to obtain compliance as soon as possible." 406 U.S. at 507, 92 S.Ct. at 1756.
 
 
 55
 To conclude, we believe the district court erred in its ripeness analysis in regard to the manufacturers and dealers. Although the court correctly noted that the more relaxed standing requirements for First Amendment cases do not apply in the present case because the Crime Control Act does not chill the exercise of a constitutionally protected right, the court failed to consider the "actual present harm" alleged and whether such harm created an injury-in-fact ripe for judicial review.[12] The district court did not consider in regard to the Group I plaintiffs the economic burden imposed by the Act, the hardship incurred by postponing review, or whether the United States had made it clear that immediate compliance was expected. When a statute creates substantial economic burdens and compliance is coerced by the threat of enforcement, it is not necessary to determine whether a plaintiff subject to the regulation has sufficiently alleged an intention to refuse to comply; it is sufficient for the plaintiff to demonstrate the statute's direct and immediate impact on his business and to establish that compliance with the regulation imposed will cause significant economic harm. Abbott Labs., 387 U.S. at 153, 87 S.Ct. at 1517-18. It is not necessary to try to determine the imminence of a threatened prosecution; it is necessary, instead, to determine if the statute can realistically be expected to be enforced against a plaintiff singled out for regulation because the government has made it clear that immediate compliance is mandatory. Lake Carriers' Ass'n, 406 U.S. at 507, 92 S.Ct. at 1755-56. See also Production Credit Ass'n of Northern Ohio v. Farm Credit Admin., 846 F.2d 373, 375 (6th Cir.1988) (when examining whether a challenge to the validity of a regulation is ripe for pre-enforcement review, the court must determine whether the impact of the regulation imposes a substantial burden of compliance and will be applied to plaintiffs in the future), cert. denied, 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988). In the present case, we believe the manufacturers and dealers have met the ripeness requirements of Abbott Labs. and Lake Carriers' Ass'n, which were cases that involved similar economic harm. Accordingly, we find the issues presented by the manufacturers' and dealers' Commerce Clause and Equal Protection challenges to the Crime Control Act are ripe for judicial review under the Declaratory Judgment Act.
 
 C. Fitness for Judicial Review
 
 56
 Finally, we must examine whether the issues raised by the Group I plaintiffs are presently fit for judicial resolution. As the Court in Abbott Labs. indicated, when ruling under the Declaratory Judgment Act, usually only purely legal issues are fit for judicial resolution before prosecution is initiated. 387 U.S. at 148, 87 S.Ct. at 1515. See also Thomas v. Union Carbide Agricultural Products Co., 473 U.S. at 581, 105 S.Ct. at 3333 ("issue presented is purely legal and will not be clarified by further factual development"); Brown & Williamson Tobacco Corp., 710 F.2d at 1171 (question of law which requires no further fact-finding is fit for judicial review).
 
 
 57
 1. Equal Protection and Commerce Clause Challenges
 
 
 58
 The Group I plaintiffs bring a facial challenge to the constitutionality of the Crime Control Act on Commerce Clause and Equal Protection grounds, which are purely legal issues. Further development of a factual record by prosecution of these plaintiffs would not inform the court's legal analysis. In considering the fitness of an issue for judicial review, the court must ensure that a record adequate to support an informed decision exists when the case is heard. Abbott Labs., 387 U.S. at 149, 87 S.Ct. at 1515-16. Usually until the controversy has become focused in a concrete factual situation, it is difficult for the court to evaluate the practical merits of the position of each party. See Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758-59 (questions presented to the court must be resolved, "not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action"). In the present case, the bare text of the unenforced statute indicates the harm the Act will engender, and the actual practices of enforcement are not relevant to the debate involving its constitutionality under the Commerce Clause and Equal Protection Clause.
 
 
 59
 For example, in Counts Four and Seven, the manufacturers and dealers contend that the Act violates the Equal Protection Clause because it protects from further regulation some manufacturers' semiautomatic assault weapons, while banning other nearly identical products of the same type, capacity, and function.[13] No factual development can change what the statute bans and what it protects.[14] Courts have found that the legal issues presented by an equal protection challenge may be conclusively resolved before enforcement of a statute or ordinance. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210-12, 115 S.Ct. 2097, 2104-05, 132 L.Ed.2d 158 (1995) (subcontractor could seek forward-looking declaratory and injunctive relief for his challenge that the race-based presumptions used in subcontractor compensation clauses violated the Equal Protection Clause); Zielasko v. Ohio, 873 F.2d 957, 958-59 (6th Cir.1989) (equal protection challenge justiciable prior to criminal prosecution). The challenge in Count Three of the complaint also presents a purely legal issue--the scope of Congress' power to legislate under the Commerce Clause. The court's determination of whether the Crime Control Act violates the Commerce Clause can be made upon the legal issues presented. See Pic-A-State Pa., Inc., 76 F.3d at 1294 (interstate lottery ticket seller's challenge to the Interstate Wagering amendment as unconstitutional under the Commerce Clause was purely legal issue ripe for pre-enforcement review).
 
 
 60
 We find no reason related to the constitutional or prudential concerns of the ripeness doctrine for requiring the Group I plaintiffs to undergo a criminal prosecution before bringing their Equal Protection and Commerce Clause challenges. The statute cannot be interpreted more narrowly on an "as applied" basis in order to avoid these constitutional issues. A constitutional decision prior to enforcement of the Act will be rendered at the behest of those actually injured and singled out by the statute, rather than at the behest of those who wish merely to impose their own views of public policy on the government. See Valley Forge, 454 U.S. at 473, 102 S.Ct. at 759. In regard to these issues, the manufacturers and dealers have alleged a "personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), citing Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Enforcement of the Act against the manufacturers and dealers would not serve to further sharpen or focus their Commerce Clause or Equal Protection challenges. Accordingly, we find that the Commerce Clause and Equal Protection challenges in Counts Three, Four, and Seven of the complaint brought by the Group I plaintiffs are currently fit for judicial resolution.
 
 2. Vagueness Challenges
 
 61
 However, we find that the vagueness challenges in Counts One, Two, Five, and Six of the complaint are not currently fit for judicial resolution. Generally, courts have found that "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand." Maynard v. Cartwright, 486 U.S. 356, 361, 108 S.Ct. 1853, 1857-58, 100 L.Ed.2d 372 (1988). In other words, the statute must be judged on an as-applied basis, and a facial challenge before the statute has been applied is premature. United States v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); United States v. Hofstatter, 8 F.3d 316, 321 (6th Cir.1993), cert. denied, 510 U.S. 1131, 114 S.Ct. 1101, 127 L.Ed.2d 413 (1994). Nevertheless, this court in Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250 (6th Cir.1994), found that the district court's review of a City of Columbus ordinance "on an as applied basis" was, in the circumstances of that case, "an erroneous way to approach the vagueness problem," because the ordinance banning certain assault weapons was obviously vague on its face. Id. at 254. In Springfield Armory, Inc., the ordinance defined "assault weapons" by naming forty-six individual models of rifles, shotguns and pistols, listed by model name and manufacturer. Added to the prohibition against these weapons was the following phrase:
 
 
 62
 other models by the same manufacturer with the same action design that have slight modifications or enhancements of firearms listed ... provided the caliber exceeds .22 rimfire.
 
 
 63
 Id. at 252. This court found that the term "slight modifications" was unconstitutionally vague and made the ordinance invalid on its face. Id. at 254.
 
 
 64
 We find the present case distinguishable from Springfield Armory for two reasons. First, in Springfield Armory, the court did not address the justiciability requirements of Article III. Second, the court was reviewing a city ordinance, not a federal statute enacted by Congress, and did not have to consider whether there had been "final agency action" in regard to an interpretation of the provision alleged to be vague. In contrast, in the present case, the Crime Control Act delegates rulemaking authority to the Secretary of the Treasury. 18 U.S.C. § 926. The Secretary, in turn, has delegated that authority to the BATF, which has the authority to make rules designating in greater specificity the requirements of the statute. See Treas. Dep't Order No. 221, 37 Fed.Reg. 11696, 11696-11697 (1972). See also 27 C.F.R. Part 178. William Earle of the BATF has attested that a person desiring a determination of whether a particular weapon or accessory is prohibited under the Act may apply to the BATF's Firearms Technology Branch. Plaintiffs in the present case have not gone through this formal procedure. Because there has been no final agency action interpreting the provisions of the statute alleged to be vague, plaintiffs' vagueness challenges are premature. Abbott Labs., 387 U.S. at 149, 87 S.Ct. at 1515-16. We believe a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute.
 
 
 65
 Plaintiffs' vagueness challenges are premised on the alleged harm that one must guess, at his own risk, the meaning of the statute. For example, plaintiffs contend they are uncertain what weapons are "copies" or "duplicates" of those listed in 18 U.S.C. § 921(a)(30)(A). However, plaintiffs' allegations that they are "unable to ascertain the meaning of various restrictions" presently lacks the factual context which would be developed by an administrative determination. We believe such a context is necessary to sharpen the presentation of issues upon which the court depends for "illumination of difficult constitutional issues." Baker v. Carr, 369 U.S. at 204, 82 S.Ct. at 703. This court cannot determine in a vacuum whether a particular firearm is a "copy or duplicate" of one prohibited by the Act until a final agency decision has been made. Other courts agree that vagueness challenges to the Crime Control Act are not ripe for pre-enforcement review. See Mack v. United States, 66 F.3d 1025, 1033 (9th Cir.1995) (allegation that criminal prohibition of Crime Control Act is ambiguous is not ripe for review), reversed on other grounds, Printz v. United States, 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); Navegar, Inc., 103 F.3d at 1001 (vagueness challenge to provisions of Crime Control Act are not justiciable prior to enforcement of the Act).
 
 
 66
 Plaintiffs also contend that the terms "flash suppressor" and "pistol grip that protrudes conspicuously beneath the action of the weapon" in § 921(a)(30)(B) of the Act are impermissibly vague. Plaintiffs provide no reason why the term "flash suppressor" is vague. Their allegation that the term "protrudes conspicuously" is vague would perhaps be ripe for judicial review if the provision were impermissibly vague in all its applications. As the Supreme Court has stated in Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95, 102 S.Ct. 1186, 1191-92, 71 L.Ed.2d 362 (1982), a court can find a statute unconstitutionally vague on its face only if the court concludes that it is capable of no valid application. In the present case, plaintiffs have not demonstrated that the term "protrudes conspicuously" is impermissibly vague in all its applications. As the court in Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681 (2nd Cir.1996), pointed out when reviewing a similar term in a city ordinance that banned certain assault weapons, most sporting firearms "employ a more traditional pistol grip built into the wrist of the stock of the firearm" and photographs demonstrated a sufficient number of assault rifles, which were plainly equipped with "conspicuously protruding grips," to indicate that the term is not vague in all its applications. Id. at 685. Because there are possible valid applications, a vagueness challenge to this provision of the Act on its face is premature. Village of Hoffman Estates, 455 U.S. at 494-95, 102 S.Ct. at 1191-92.
 
 
 67
 For all these reasons, we find that plaintiffs' vagueness challenges in Counts One, Two, Five, and Six of the complaint are not currently fit for judicial resolution and were properly dismissed by the district court.
 
 IV. The Individual Plaintiffs (Group II)
 
 68
 A. Standing.
 
 
 69
 We find the individual plaintiffs do not have standing to sue. The rationale applied to the dealers and manufacturers (Group I plaintiffs) does not apply to them, as they have suffered no economic harm. They do not face the dilemma of whether to risk criminal and civil penalties to defy prohibitions that significantly affect their businesses or to comply with the Act and incur significant economic harm. We find that, in contrast, the individual plaintiffs have failed to demonstrate a cognizable injury-in-fact sufficient to confer standing prior to enforcement of the Act against them. "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir.1983). The individual plaintiffs aver that they "desire" and "wish" to engage in certain possibly prohibited activities, but are "restrained" and "inhibited" from doing so. They allege that they "are unable and unwilling, in light of the serious penalties threatened for violation of the statute, to obtain and possess the firearms and large capacity ammunition feeding devices prohibited by the statute." Although the standing requirement of an injury-in-fact is fairly lenient and may include a wide variety of economic, aesthetic, environmental, and other harms, the individual plaintiffs herein allege merely that they would like to engage in conduct, which might be prohibited by the statute, without indicating how they are currently harmed by the prohibitions other than their fear of prosecution. Plaintiffs' assertions that they "wish" or "intend" to engage in proscribed conduct is not sufficient to establish an injury-in-fact under Article III. Lujan, 504 U.S. at 564, 112 S.Ct. at 2138. The mere "possibility of criminal sanctions applying does not in and of itself create a case or controversy." Boating Industry Associations v. Marshall, 601 F.2d 1376, 1384 (9th Cir.1979); Jensen v. National Marine Fisheries Serv. (NOAA ), 512 F.2d 1189, 1191 (9th Cir.1975). The individual plaintiffs have failed to show the high degree of immediacy necessary for standing when fear of prosecution is the only harm alleged. San Diego County Gun Rights Committee, 98 F.3d at 1127.
 
 
 70
 We agree with the district court's conclusion that the plaintiffs who telephoned BATF agents, submitted a hypothetical question, and received an answer that the questioned activity could subject them to federal prosecution does not confer standing. The threat of prosecution against these plaintiffs is still abstract, hypothetical, and speculative. Allen v. Wright, 468 U.S. at 756, 104 S.Ct. at 3327. Without a direct injury that is "presently effective in fact," the individual plaintiffs do not demonstrate the personal stake and interest necessary to give the litigation the concreteness required for Article III standing. Raines v. Byrd, at ----, 117 S.Ct. at 2317.
 
 
 71
 Furthermore, plaintiffs' implication that the statute has a "chilling" effect on their desire to purchase the outlawed weapons and accessories does not establish standing. "Every criminal law, by its very existence, may have some chilling effect on personal behavior. That is the reason for its passage." Doe v. Duling, 782 F.2d 1202, 1206 (4th Cir.1986). Plaintiffs do not allege that the law "chills" because it forces them to forego constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.[15] Except for cases involving core First Amendment rights, the "existence of a 'chilling effect' ... has never been considered a sufficient basis, in and of itself, for prohibiting" [government action]. Younger v. Harris, 401 U.S. 37, 51, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971). As the Supreme Court has noted, "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1972).
 
 
 72
 Plaintiffs' allegations of fear of prosecution, which thwarts their desire to possess or transfer prohibited products, affects not only the named plaintiffs, but also anyone desiring to possess the products proscribed by the Crime Control Act. The Supreme Court has refrained from adjudicating "generalized grievances," pervasively shared. Valley Forge Christian College, 454 U.S. at 474-75, 102 S.Ct. at 759-60. The individual plaintiffs' alleged harm amounts to no more than a " 'generalized grievance' shared in substantially equal measure by ... a large class of citizens," and thus does not warrant the exercise of jurisdiction. Warth v. Seldin, 422 U.S. at 499, 95 S.Ct. at 2205. One of the policies against adjudicating generalized grievances is that the court should "decide the case with some confidence that its decision will not pave the way for lawsuits, which have some, but not all, of the facts actually decided by the court." Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 759. As the court in San Diego Gun Rights Committee, 98 F.3d at 1133, indicated, granting standing to gun rights enthusiasts, such as the individual plaintiffs in the present case, would allow virtually anyone to challenge a federal act concerning gun control. As the Supreme Court stated in Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923):
 
 
 73
 The party who invokes the power [of judicial review] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.
 
 
 74
 To conclude, the injury-in-fact alleged by the individual plaintiffs is not sufficient to fulfill the standing requirement of Article III.
 
 V. Association Plaintiffs (Group III)
 A. Standing
 
 75
 The Supreme Court has stated that an association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Because none of the declarations submitted by the NRA or MACC members allege an injury-in-fact sufficient to confer standing in the individual member's own right, the declarations are insufficient to confer standing on the National Rifle Association of America or the Michigan United Conservation Clubs. The associations, thus, do not have standing to challenge the Act.
 
 VI. Conclusion
 
 76
 The district court's order granting defendants' motion to dismiss for lack of subject matter jurisdiction is AFFIRMED in part and REVERSED in part.
 
 A. Standing
 
 77
 We AFFIRM the district court's conclusion that plaintiffs-appellants, Charles Duncan, James E. Flynn, James J. Fotis, and Craig D. Sandler (Group II plaintiffs), and the National Rifle Association of America and Michigan United Conservation Clubs (Group III plaintiffs), do not have standing to challenge the statute on any grounds because they have not suffered an actual or imminent injury-in-fact.
 
 
 78
 We REVERSE the district court's conclusion that plaintiffs-appellants, Olympic Arms, Calico Light Weapons Systems, D.C. Engineering, Ammo Dump, and Glenn Duncan (Group I plaintiffs) do not have standing to sue. We find these manufacturer and dealer plaintiffs have demonstrated a cognizable injury-in-fact that meets the requirements of Article III and have standing to sue.
 
 B. Ripeness
 
 79
 We AFFIRM the district court's dismissal of the claims in Counts One, Two, Five, and Six of the complaint as not ripe for judicial review.
 
 
 80
 We REVERSE the district court's dismissal of the claims in Counts Three, Four, and Seven of the complaint, which we find are ripe for judicial review.
 
 C. Summary
 
 81
 We REMAND this case to the district court for further proceedings on the merit of the Group I plaintiffs' Commerce Clause and Equal Protections challenges to the Crime Control Act in Counts Three, Four, and Seven of the complaint.
 
 
 82
 RYAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 83
 I concur in Parts I, II, IV, and V of my brother's scholarly and well-reasoned opinion, but must dissent from Part III. There, the majority concludes that those plaintiffs who are manufacturers and dealers have standing to sue because they have suffered an injury-in-fact, namely, an economic injury. While I believe the majority correctly states the law with regard to a plaintiff's standing for economic injuries, I am constrained to dissent because my review of the pleadings convinces me that these plaintiffs--whom I, adopting the phraseology of the majority, will denominate the Group I plaintiffs--have never alleged or argued that they suffer from any economic harm as a result of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, 108 Stat. 1796 (1994).
 
 
 84
 As the majority correctly recognizes, "before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." Whitmore v. Arkansas, 495 U.S. 149, 154, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990). Equally well-established is the requirement that a plaintiff "must clearly and specifically set forth facts sufficient to satisfy the[ ] Art. III standing requirements. A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." Id. at 155-56, 110 S.Ct. at 1723. Thus, the onus here is on the plaintiffs, the parties invoking federal jurisdiction, to plead sufficient facts to demonstrate their standing in order to confirm jurisdiction in the federal court, which is " 'presumed to lack jurisdiction, unless the contrary appears affirmatively from the record.' " San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1126 (9th Cir.1996) (citation omitted); see King Iron Bridge & Mfg. Co. v. County of Otoe, 120 U.S. 225, 226, 7 S.Ct. 552, 552-53, 30 L.Ed. 623 (1887). And an essential part of the standing inquiry is the existence of an " 'injury in fact,' " one which is "concrete in both a qualitative and temporal sense." Whitmore, 495 U.S. at 155, 110 S.Ct. at 1723.
 
 
 85
 The majority believes that the plaintiffs have adequately stated an injury-in-fact, in the form of economic damage sustained as a result of the Crime Control Act's strictures. The majority points to the manufacturer-plaintiffs' allegations that "they will be forced to redesign and relabel some products and cease production of others," and the dealer-plaintiffs' assertion that "compliance with the Act affects their daily businesses by prohibiting the possession and sale of specific weapons and ammunition feeding devices." (Maj. op. at 281.) The majority concludes from this that the manufacturers and dealers "have suffered economic harm from the impact of passage of the Act, which has restricted the operation of their businesses in various ways." (Id. at 281.) Elsewhere, the majority asserts that compliance will "requir[e] either a substantial monetary investment or loss in order to comply." (Id. at 286.)
 
 
 86
 This understanding simply does not comport with the pleadings as I read them. Having combed the record and the briefs, I have found only a minuscule number of references from which an economic injury is even remotely inferable. The plaintiffs have stated baldly that the Crime Control Act has "affected their daily business," with virtually no explication. They have asserted that the manufacturers have been "deterred" from making certain unspecified "intrastate transactions," and have asserted that they have changed the design and name of their firearms. They have also asserted that "[t]he manufacturing plaintiffs were forced to ... cease the production of" some unspecified products.
 
 
 87
 In an attempt to address my nagging sense that this pleading simply does not, as it were, cut the constitutional mustard, I have surveyed a number of cases in which courts have discussed, with some specificity, the execution of the general pleading principles sketched above--that is, cases in which a plaintiff's pleading of economic injury has been addressed and found either deficient or sufficient. This exercise has served to confirm my sense that the plaintiffs' pleading here is inadequate to justify this court's finding that standing has been established on the basis of an economic injury.
 
 
 88
 For example, in United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), a case that has been characterized as "surely [going] to the very outer limit of the law" on standing, Whitmore, 495 U.S. at 159, 110 S.Ct. at 1725, a student environmental group brought suit against the Interstate Commerce Commission seeking to enjoin enforcement of certain surcharges on freight rates. In support of standing, SCRAP "alleged that each of its members was caused to pay more for finished products" as a result of the rate hikes. SCRAP, 412 U.S. at 678, 93 S.Ct. at 2411. That was found sufficient to convey standing because it amounted to an allegation that the plaintiffs "ha[d] been or w[ould] in fact be perceptibly harmed by the challenged ... action," and because the "allegations [were] ... capable of proof at trial." Id. at 688-89, 93 S.Ct. at 2416. Likewise, in Wedges/Ledges of California, Inc. v. City of Phoenix, 24 F.3d 56 (9th Cir.1994), the plaintiffs "alleged that they suffered 'lost sales, lost profits, lost business opportunities and other economic harms' as a consequence of the [defendant's] acts." Id. at 60. This was sufficient to challenge a government regulation that "directly affect[ed] [the plaintiffs'] customers and restrict[ed] [their] market." Id. at 61. Here, in contrast to these two cases, the plaintiffs have never asserted that the Crime Control Act will cause any perceptible financial harm, in any form.
 
 
 89
 In McKinney v. United States Department of Treasury, 799 F.2d 1544 (Fed.Cir.1986), the court considered a lawsuit seeking injunctive relief to bar importation of goods produced in the Soviet Union by forced labor. The plaintiff "assert[ed] standing on the basis of its members and supporters who include 'manufacturers or producers or workers employed by manufacturers or producers of products which are similar to and compete with goods or products being imported unlawfully from the Soviet Union.' " Id. at 1553 (footnote omitted). This allegation failed because
 
 
 90
 [t]he amended complaint does not identify any individuals, industries, producers, or workers in competition with the Soviet products ..., nor does the complaint provide any information regarding the nature, circumstances, or basis of the injury. Under such circumstances any alleged injury is wholly speculative and conjectural. In the absence of some reasonable delineation of the injury and that it was caused by identified Soviet goods, we hold that [the plaintiff] may not claim standing based solely upon the allegation that some of its members may be producers or workers.
 
 
 91
 Id. at 1554 (footnote and citation omitted). The court explained that "[r]elevant information might include one or more of the following: (1) reduction in product pricing; (2) decline in domestic sales; (3) decline in domestic production; (4) drop in producers' share prices; (5) decline in the number of producers; (6) producer bankruptcies; (7) worker layoffs or cutback; or (8) reduction in workers' wages." Id. at 1554 n. 27. It seems patent to me that the plaintiffs' pleading here is characterized by exactly the same type of generality as found in McKinney, and suffers from exactly the same type of omissions.
 
 
 92
 Finally, in Adams v. Watson, 10 F.3d 915 (1st Cir.1993), the court considered a lawsuit in which plaintiffs were objecting to state-imposed price regulations in the dairy industry. The first amended complaint was inadequate; it "included allegations that the pricing order caused appellants competitive injury and economic harm." Specifically, it
 
 
 93
 merely alleged that the pricing order "has the same effect as a 'customs duty' or 'protective tariff' on the importation of milk produced in other states," "subsidizes Massachusetts farmers which causes the disorderly marketing of milk," causes out-of-state farmers, including plaintiffs, to suffer economic harm and competitive disadvantage because it subsidizes Massachusetts farmers, and may force out-of-state farmers, including plaintiffs, out of business.
 
 
 94
 Id. at 917 & n. 6. Needless to say, this inadequate pleading offers far more in the way of economic-injury allegations than does the complaint here. The Adams court reversed the district court, however, insofar as it held that the plaintiffs should have been permitted to "recast their first amended complaint by adding two paragraphs for the stated purpose of alleging 'with greater specificity "injury in fact." ' " Id. at 917. The amendment would have set forth the specific "chain of economic events" that the plaintiffs believed would "result in [their] loss of future income, profits, and business opportunities." Id. at 919. Again, it is needless to say that the plaintiffs here have never suggested a specific "chain of economic events" that caused them harm.
 
 
 95
 To emphasize, the plaintiffs here have never even uttered the words "economic injury" or anything along those lines. They have never claimed that any revenue loss or expenditure--either currently existing or potentially forthcoming--is attributable to the Crime Control Act. Thus, contrary to the intimations of the majority, there is no allegation--and certainly no evidence--that the plaintiffs have suffered or will suffer "substantial economic harm" as a result of the Crime Control Act. And in addition to not having been pleaded, the theory of economic harm was never addressed by the district court, and has not been argued by the parties in their briefs.
 
 
 96
 Presumably, the majority feels that economic harm is palpable here: that if weapons are banned, or if redesigning or relabelling is required, the manufacturers and dealers of those weapons are necessarily injured, particularly vis-a-vis certain competitors whose products were not affected by the Crime Control Act. And indeed, there is a line of "direct competitor" cases in which "future injury-in-fact is viewed as 'obvious' since government action that removes or eases only the competitive burdens on the plaintiff's rivals plainly disadvantages the plaintiff's competitive position in the relevant marketplace." Adams, 10 F.3d at 922 (emphasis omitted). But as the Adams court cautioned, " '[w]here "injury" and "cause" are not obvious, the plaintiff must plead their existence in his complaint with a fair degree of specificity.' " Id. (citation omitted).
 
 
 97
 To me, this case does not present the court with an obvious situation of economic harm. To again quote the Adams court,All predictions are conjectural to a degree.... Economics is a cross between an art and a science, which is to say, both an imperfect art and an imperfect science. While the law of supply and demand may sometimes be suspended by unpredictable marketplace decisions, and even lesser fortuities like bovine obstinacy, basic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and probable market behavior.
 
 
 98
 Id. at 923. I do not decline to join my colleagues' opinion out of any reticence stemming from a flawed understanding of basic economic principles. Instead, I see a wide variety of possible explanations for why, here, the Group I plaintiffs would not have suffered any economic harm from the Crime Control Act, and why the absence of actual harm is the most obvious explanation for why they failed to allude to such harm in their complaint.
 
 
 99
 It is, for example, quite possible that the manufacturers here have not actually stopped manufacturing prohibited weapons, despite the dictates of the Crime Control Act; nowhere do they straightforwardly assert that they have desisted from manufacturing--they state only that they have been "deterred." While they state that they have relabelled and redesigned some products, there is no corresponding statement of what that cost them, or any statement that they have not been able to raise their prices sufficiently to cover whatever costs did result. The latter possibility is definitely suggested by San Diego County, 98 F.3d 1121, in which the plaintiffs explicitly complained that manufacturers had raised the price of certain weapons by 40 to 100%. See id. at 1130. Relatedly, given that the relevant marketplace is extremely broad--indeed, nationwide--it is less likely that the Group I plaintiffs will experience future economic loss from the disadvantages apparently wrought by the Crime Control Act, cf. Adams, 10 F.3d at 922, and correspondingly less likely that even if there were a loss, it could be causally attributable to the Crime Control Act, see San Diego County, 98 F.3d at 1130.
 
 
 100
 In any event, we are not faced with the usual case, where the question is whether allegations of future competitive injury are too speculative to confer standing. We are instead faced with a case in which the plaintiffs have failed to even mention economic damage as a basis for standing, but where the majority has drawn what I believe are unwarranted conclusions from circumstances alluded to in the pleadings. Because I find the majority's reasoning entirely too speculative, I respectfully dissent.
 
 
 
 [1]
 Two of the original plaintiffs--Navegar, Inc., doing business as Intratec, a Florida corporation, and Thomas L. Heritier--did not join in the appeal
 
 
 [2]
 18 U.S.C. § 921(a)(30)(A) provides:
 (30) The term "semiautomatic assault weapon" means--
 (A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as--
 (i)Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);
 (ii) Action Arms Israeli Military Industries UZI and Galil;
 (iii) Beretta Ar70 (SC-70);
 (iv) Colt AR-15;
 (v) Fabrique National FN/FAL, FN/LAR, and FNC;
 (vi) SWD M-10, M-11, M-11/9, and M-12;
 (vii) Steyr AUG;
 (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and
 (ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12.
 
 
 [3]
 18 U.S.C. § 921(a)(31) provides:
 The term "large capacity ammunition feeding device"--
 (A) means a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; but
 (B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.
 
 
 [4]
 Plaintiffs argue that "if any plaintiff in a case demonstrates a 'case and controversy,' the constitutional requirements are met for all." This is a misstatement of the law. It is true that as long as one plaintiff meets the requirements of Article III, the court can adjudicate the issues raised in the complaint. Although it is not necessary to inquire whether the other plaintiffs have standing before adjudicating the issues raised, Secretary of the Interior v. California, 464 U.S. 312, 319 n. 3, 104 S.Ct. 656, 660 n. 3, 78 L.Ed.2d 496 (1984), this does not mean that the other plaintiffs have necessarily met the constitutional requirements for standing. It simply means that no further inquiry was made about whether the other plaintiffs had standing, because the court deemed it unnecessary. As the Supreme Court has stated, there is no need to "address the standing of the other respondents, whose position is identical." Id. In contrast, in the present case, we deem it necessary to inquire about the standing of each category of plaintiffs because their positions are not identical. The injury-in-fact pled by the Group I plaintiffs is very different from that of Group II or Group III
 
 
 [5]
 Because the complaint asks the court to declare the status of "a frame or a receiver" and to determine whether it fits within the grandfather provision, we will treat this as a vagueness challenge
 
 
 [6]
 The Act provides:
 (a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
 
 
 [7]
 Contrary to the dissent's contention, we do not believe that greater specificity in pleading is required. In Abbott Labs., the Supreme Court case most analogous to the present one, the Court did not require such specificity. In Abbott Labs., the Court found that a regulation requiring the relabeling of products by drug manufacturers created a concrete injury-in-fact. 387 U.S. at 152-53, 87 S.Ct. at 1517-18. In Abbott Labs., the cost of relabeling was not specified and the drug manufacturers were not required to demonstrate that a rise in prices could not cover these costs. We believe the dissent errs in suggesting that such data is required when a regulation, such as the one in Abbott Labs. has an obvious economic impact. We note that not once in Abbott Labs. did the Supreme Court use the term "economic injury" or "economic damage," as it is a matter of common sense that a company that must relabel products will be forced to make additional expenditures. Similarly, in the present case, we believe it is a matter of common sense that manufacturers, who must both redesign and relabel products, will be forced to make additional expenditures, and a company that is forced to cease producing a product, which it wishes to continue to produce, has sustained a concrete economic injury. In Abbott Labs., the Supreme Court found there was "no question that petitioners have sufficient standing," because the regulation at issue required relabeling of products which would require "significant changes in their everyday business practices." Id. at 154, 87 S.Ct. at 1518. We believe the changes required by the Act in the present case go far beyond the relabeling of products, which in Abbott Labs. was by itself a sufficient "injury-in-fact" to confer standing. Finally, we note that contrary to the dissent's contention, the Group I plaintiffs specifically stated that they have "stop[ped] production" of prohibited products, and this type of injury was explicitly argued in their briefs
 
 
 [8]
 Our finding that the economic injury alleged by the manufacturers and dealers is sufficient to confer standing is not inconsistent with the holding of the Ninth Circuit in San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121 (9th Cir.1996). There, the court found that an economic injury is clearly a sufficient basis for standing, but that the plaintiffs failed to demonstrate that their alleged economic injury was fairly traceable to the Crime Control Act. The plaintiffs' alleged economic injury was that the Crime Control Act had caused the price of banned devices and grandfathered arms to increase "from 40% to 100%." Id. at 1130. The court in San Diego found the plaintiffs did not have standing, because the connection between the alleged economic injury and the prohibitions in the statute was too attenuated. Id. In contrast, in the present case, there is a direct causal connection between the economic injuries alleged and the prohibitions in the statute
 
 
 [9]
 As previously noted in footnote one, Navegar, Inc., doing business as Intratec, was one of the original plaintiffs in the present case, but did not join in the appeal
 
 
 [10]
 Portions of the Act make it unlawful to manufacture or transfer Intratec's "TEC-9," "TEC-DC9" and "TEC-22" models and Penn Arm's "Striker 12" model of semiautomatic assault weapons. 18 U.S.C. §§ 921(a)(30)(A)(viii), (ix)
 
 
 [11]
 At issue in Abbott Labs. were regulations interpreting a statutory command to print generic names "prominently." The agency interpreted the statute to require each use of the name to be so printed
 
 
 [12]
 In the present case, plaintiffs do not allege that the Crime Control Act infringes upon or "chills" their exercise of a constitutionally protected right to bear arms in violation of the Second Amendment. Thus, they do not allege that the prohibitions of the Act force them to forego an activity that, in and of itself, is constitutionally protected. The manufacturers and dealers allege, instead, that the prohibitions against the activity they wish to engage in violate the Commerce Clause and Equal Protection Clause and cause them economic harm
 
 
 [13]
 The prohibitions of the Act expressly do not include any of the weapons listed in § 922, Appendix A or described in § 922(v)(3)
 
 
 [14]
 For example, plaintiffs allege that whereas the "Colt AR-15" is banned under § 921(a)(30)(A)(iv), the "Ruger Mini-14" is protected under 18 U.S.C. § 922, Appendix A. Plaintiffs contend the two firearms are virtually identical, but that the Act singles out certain products and producers for prohibition, but gives express protection to the products of manufacturers with a greater constituency. In Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250, 252 (6th Cir.1994), this court found that a city ordinance's ban of certain assault weapons by brand name, without including within the prohibition similar assault weapons of the same type, function, or capability, was not rationally related to any legitimate government purpose
 
 
 [15]
 In contrast, the plaintiffs in San Diego Gun Rights Committee argued the Crime Control Act infringed on their constitutionally protected right to bear arms under the Second Amendment. 98 F.3d at 1124-25. Plaintiffs in the present case make no such allegation, and we do not consider the issue