MICHIGAN WOLFDOG ASSOCIA-TION, INC., a not-for-profit Michigan corporation, Cathy Sterling, an individual, Plaintiffs,

v.

ST. CLAIR COUNTY, Defendant.

No. 00–40370.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 30, 2000.

Christopher A. Cornwall, Kotz, Sangster, Detroit, MI, for plaintiff.

Peter R. George, St. Clair County Prosecutor's Office, Port Huron, MI, for defendant.

Danielle N. Mammel, Kotz, Sangster, Detroit, MI, for plaintiff.

Randall W. Whitworth, Michigan Department of Attorney General, Finance and Development Section, Lansing, MI, for movant.

## ORDER DENYING PRELIMINARY INJUNCTION

GADOLA, District Judge.

Before the Court is Plaintiffs' Motion for Temporary Restraining Order filed on October 30, 2000. A hearing on Plaintiffs' motion was held in open court on November 20, 2000, the Honorable Paul V. Gadola presiding, and all parties were given an opportunity to present arguments in support of or in opposition to that motion.

Pursuant to the agreement of the all parties, this Court will consider Plaintiffs' motion to be a motion for a preliminary injunction rather than a motion for a temporary restraining order. For the reasons set forth below, this Court will deny Plaintiffs' motion.

## Factual Background

This civil action challenges the constitutionality of the Michigan Wolf–Dog Cross Act (the "Act"), M.C.L. §§ 287.1001–287.1023, which became effective on June 29, 2000 and which included a 120–day grace period prior to the beginning of its enforcement on October 29, 2000.[1] The Act was "enacted in memory of Angie Nickerson," M.C.L. § 287.1001, a five-year-old girl from National Mine in the Upper Peninsula who was mauled, killed, and partially consumed by an alleged wolf-dog cross in March, 1989. (*See* Pls.Ex. 2; Att'y Gen.Exs. 8–11 (autopsy photographs of Angie Nickerson).)

Plaintiffs are the Michigan Wolfdog Association, Inc. and Cathy Sterling. Plaintiff Michigan Wolfdog Association, Inc. "is a not-for-profit corporation incorporated in the State of Michigan which undertakes activities for the advancement and betterment of Wolfdogs and their owners." (Compl.¶ 1.) Plaintiff Michigan Wolfdog Association, Inc. has approximately 130 members, most of whom own wolf-dog crosses. (*See* Pls.Ex. 3 (Van Scoik Aff.) ¶ 1.) Plaintiff Cathy Sterling "resides in Emmet, Michigan, and has, at all material times, been the owner of one or more animals known as Wolfdogs." (Compl. ¶ 2; *see* Pls.Ex. 4 (Sterling Aff.) ¶¶ 1–2.)

Defendant St. Clair County is a Michigan municipal corporation empowered to enforce the laws of the State of Michigan such as the Act at issue in the instant civil action.

The Department of the Attorney General, on behalf of the State of Michigan, has filed a motion to intervene, as is its right pursuant to 28 U.S.C. § 2403.

## Procedural History

On October 23, 2000, Plaintiffs filed their Complaint in this civil action. On October 30, 2000, Plaintiffs' filed a Motion for a Temporary Restraining Order.

On October 31, 2000, this Court dismissed without prejudice Counts VI, VII, VIII, IX, and X of Plaintiffs' Complaint as these counts alleged state law claims for relief. Only Counts I, II, III, IV, and V— which are federal law claims for relief— remain before this Court. Those claims are summarized as follows:

**Count I:** Section 287.1002(p) of the Act is unconstitutionally vague and therefore deprives Plaintiffs of property without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution and the Civil Rights Act of 1871,[2] as amended, 42 U.S.C. § 1983;[3]

**Count II:** Section 287.1013 of the Act permits entry onto private property without a search warrant or probable cause in violation of Plaintiffs' rights against unreasonable searches and seizures

---

1. The relative urgency of the motion before the Court was created, in part, by Plaintiffs having waited until the end of the grace period to file this civil action and until after the end of the grace period to seek temporary injunctive relief.

2. In their Complaint, Plaintiffs refer to the "Federal Civil Rights Act of 1964," which was codified at 42 U.S.C. § 2000e, *et seq.*; Plaintiffs also cite 42 U.S.C. § 1983. At oral argument, Plaintiffs conceded that they meant to refer to the Civil Rights Act of 1871, as amended, which was codified, in part, at 42 U.S.C. § 1983.

3. Section 1983 grants a right of action to persons claiming to have been deprived of "rights, privileges, or immunities secured by the Constitution" or federal law, but it does not grant or create a substantive right. *See Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

under the Fourth Amendment[4] of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983;

Count III: Sections 287.1016 and 287.1017 of the Act provide for the civil forfeiture of "wolf-dogs" without a prior judicial hearing thereby depriving Plaintiffs of property without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983;

Count IV: the Act "discriminates against Plaintiffs by treating them and their animals differently from other similarly situated owners of animals without a rational basis" in violation of the Fourteenth Amendment of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983; and,

Count V: Section 287.1015(1)(c) of the Act imposes a criminal penalty for violations of the Act in violation of the due process and equal protection requirements of the Fourteenth Amendment of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983.

(*See* Compl. at 3–6.)

Insofar as Plaintiffs are seeking to have this Court "declar[e] and adjudg[e]" the Act "unconstitutional and null and void in its entirety," Plaintiffs also appear to be seeking relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

Because Counts I, II, III, IV, and V draw in question the constitutionality of the Act, this Court certified that fact to the Attorney General of the State of Michigan pursuant to 28 U.S.C. § 2403(b). Section 2403 permits the State of Michigan "to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality." *See* 28 U.S.C. § 2403(b). The Department of the Attorney General filed a motion to intervene on behalf of the State of Michigan, and this Court will grant that motion.

**Discussion**

Before addressing the merits of Plaintiffs' request for a preliminary injunction, this Court must review the preliminary issues of whether Plaintiffs have standing, whether the instant civil action is ripe for review, and whether this Court should abstain under a federal abstention doctrine, as requested by the Attorney General.

**1. Whether Plaintiffs Have Standing**

■ Standing is a doctrine of justiciability that concerns whether a specific person is the proper party to bring a particular action for adjudication in federal court. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.1 (3d ed.1999). In general, standing requires that the plaintiff have suffered an injury that is fairly traceable to the defendant's allegedly unlawful conduct and is likely to be redressed by the requested relief. *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir.1998) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) and *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ As mentioned above, Plaintiffs have brought this pre-enforcement challenge pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. In general, a civil action seeking a declaratory judgment is brought before an injury has occurred. *Peoples Rights Organization*, 152

---

4. In their Complaint, Plaintiffs refer to their "rights against unreasonable search and seizure under the Fifth Amendment of the U.S. Constitution." (Compl. § 18.) At oral argument, Plaintiffs' counsel acknowledged that the reference to the Fifth Amendment, rather than the Fourth Amendment, was an error.

F.3d at 527; *National Rifle Association v. Magaw*, 132 F.3d 272, 279 (6th Cir.1997). Therefore, "when seeking declaratory or injunctive relief, the plaintiff must demonstrate actual present harm or a significant possibility of future harm to justify pre-enforcement relief." *Peoples Rights Organization*, 152 F.3d at 527; *see National Rifle Association*, 132 F.3d at 279. If the injury is impending, a plaintiff who may be injured does not have to wait until he actually is injured to obtain preventive relief. *See Babbitt v. United Farm Workers Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Peoples Rights Organization*, 152 F.3d at 527.

■ An association, such as Plaintiff Michigan Wolfdog Association, Inc., can have standing as a representative of its members. *Peoples Rights Organization*, 152 F.3d at 527; *American Federation of State, County & Municipal Employees Local 506 v. Private Industry Council of Trumbull County*, 942 F.2d 376, 378 (6th Cir.1991). According to the Supreme Court, an association must satisfy three requirements to have standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Peoples Rights Organization*, 152 F.3d at 527.

■ Several courts reviewing similar cases have held that a plaintiff does not have standing to bring a vagueness challenge if that plaintiff admits that the statute clearly applies to him. *See Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Vanater v. Village of South Point*, 717 F.Supp. 1236, 1243 (S.D.Ohio 1989); *State v. Ferguson*, 57 Ohio St.3d 176, 566 N.E.2d 1230, 1231

(1991); *Hearn v. Overland Park*, 244 Kan. 638, 772 P.2d 758, 760 (1989); *Singer v. City of Cincinnati*, 57 Ohio App.3d 1, 566 N.E.2d 190 (1990); *Garcia v. Village of Tijeras*, 108 N.M. 116, 767 P.2d 355, 358 (App.1988). *But see State v. Peters*, 534 So.2d 760, 766 n. 10 (Fla.Dist.Ct.App.1988) (assuming, arguendo, that the relevant party had standing because she admitted that her dog was a pit bull but did not admit that her dog was a pit bull covered by the ordinance). *See generally* Russell G. Donaldson, *Validity and Construction of Statute, Ordinance, or Regulation Applying to Specific Dog Breeds, Such as "Pit Bulls" or "Bull Terriers,"* 80 A.L.R.4th 70, 80–83 (1990). Furthermore, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

■ Here, at this preliminary stage, Plaintiffs do not appear to have standing to assert their void-for-vagueness claim for relief. Plaintiff Cathy Sterling admits that at all times material to this civil action she has been the owner of "one or more animals known as Wolfdogs" (Compl. ¶ 2; *see* Pls.Ex. 4 (Sterling Aff.) ¶¶ 1–2), so it is clear that the Act applies to her. Similarly, Plaintiff Michigan Wolfdog Association, Inc. admits that most of its 130 members own wolf-dog crosses. (*See* Pls.Ex. 3 (Van Scoik Aff.) ¶ 1.) Those members who knowingly own wolf-dog crosses certainly would know the Act applies to them, and the association has standing only insofar as its members have standing, as discussed above. Plaintiffs have had clear notice that their wolf-dog crosses are subject to regulation by the Act. Therefore, under the authority cited above, this Court concludes that Plaintiffs do not have standing to assert the void-for-vagueness claim for relief in Count I of their Complaint. Plaintiffs do appear to have standing as to their other claims for relief because there

is a significant possibility of future harm to justify pre-enforcement relief.

### 2. Whether this Civil Action Is Ripe for Review

Ripeness is a doctrine of justiciability that concerns when review is appropriate. *See* Chemerinsky, *Federal Jurisdiction* § 2.4.1. Ripeness is similar to standing, but whereas standing is concerned with *who* is a proper party to litigate a particular civil action, ripeness is concerned with *when* a proper party may litigate that action. *See id.; Peoples Rights Organization*, 152 F.3d at 527 ("Ripeness focuses on the timing of the action rather than on the parties who bring the suit."). According to the Sixth Circuit, "[t]he basic rationale for the ripeness doctrine 'is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *National Rifle Association*, 132 F.3d at 284 (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)); *see Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir.1985). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *National Rifle Association*, 132 F.3d at 284. Federal courts are "not to entertain constitutional questions in advance of the strictest necessity." *Poe v. Ullman*, 367 U.S. 497, 503, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

■ The Sixth Circuit has stated that ripeness requires weighing three factors: (1) "the hardship to the parties if judicial relief is denied at the pre-enforcement stage in the proceedings"; (2) "the 'likelihood that the harm alleged by plaintiffs will ever come to pass'"; and (3) "whether the case is fit for judicial resolution at the pre-enforcement stage." *National Rifle Association*, 132 F.3d at 284 (quoting *United Steelworkers of America, Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194–95 (6th Cir.1988)). *See Peoples Rights Organization*, 152 F.3d at 527. *See also Abbott Laboratories v. Gardner*, 387 U.S.

136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (ripeness "is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration"). Determining whether an action is fit for judicial resolution at the pre-enforcement stage "requires a determination of whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims." *National Rifle Association*, 132 F.3d at 284.

■ The instant case does not involve pre-enforcement review of a law that implicates First Amendment rights. According to the Sixth Circuit, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), is the "seminal case regarding pre-enforcement review outside the First Amendment context." *National Rifle Association*, 132 F.3d at 285. In *Abbott Laboratories*, the Supreme Court found that the new federal drug-labeling regulations at issue there affected the petitioners directly and immediately at the pre-enforcement stage because the new regulations forced the petitioners to either incur the substantial costs of complying or continue their current practice and risk serious criminal and civil penalties for not complying. 387 U.S. at 152–53, 87 S.Ct. 1507; *see also National Rifle Association*, 132 F.3d at 285 ("actual or imminent enforcement is not always a prerequisite in non-First Amendment cases, if the statute creates a 'present harm,' such as substantial economic injury"). Such an immediate impact of new regulations satisfies the hardship prong for ripeness. *See* 387 U.S. at 153, 87 S.Ct. 1507; *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 743, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) ("where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated").

Here, Plaintiffs will suffer some hardship if judicial relief is denied at the pre-

enforcement stage in the proceedings, there is a substantial probability that the harm alleged by Plaintiffs will occur, and Plaintiffs' case appears to be fit for judicial resolution at the pre-enforcement stage because at least the preliminary factual record is developed enough for this Court to fairly adjudicate Plaintiffs' likelihood of success on the merits. Therefore, this Court concludes that the instant civil action is ripe for review.

### 3. Whether this Court Should Abstain

The Attorney General requests that the Court abstain from considering the merits of this civil action. For the reasons set forth below, this Court will not abstain.

■ Of all the abstention doctrines, the only one that appears applicable to the instant case is known as the "*Pullman* abstention doctrine." According to the doctrine established in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court should abstain from deciding the constitutionality of an unclear state law until a state court has considered and clarified the law thereby making the federal court's constitutional ruling unnecessary. If there is a substantial possibility that a state court could interpret an unconstitutionally vague statute to avoid being declared unconstitutional, then the federal court should abstain from deciding the constitutionality of the statute. *See* Chemerinsky, *Federal Jurisdiction* § 12.2.1.

■ If, however, a state statute is so vague that persons to whom it applies cannot understand what is required of them, then a federal court need not abstain because it is unlikely that a state court could narrowly interpret the statute enough to avoid a constitutional question. *See Procunier v. Martinez*, 416 U.S. 396, 401 n. 5, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Baggett v. Bullitt*, 377 U.S. 360,

377–78, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). According to the Supreme Court,

> In the case where applicability of the statute is uncertain, abstention is often proper, while in the case where the vagueness claim goes to the obligations imposed by the statute, it is not, since a single state construction often would not bring the challenged statute "within the bounds of permissible constitutional certainty."

*Harris County Commissioners Court v. Moore*, 420 U.S. 77, 86 n. 9, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975) (quoting *Baggett*, 377 U.S. at 378, 84 S.Ct. 1316).

To the extent that the *Pullman* abstention doctrine applies only to a vague statute, *see Summit County Crisis Pregnancy Center, Inc. v. Fisher*, 830 F.Supp. 1029, 1032 (N.D.Ohio 1993) (holding that *Pullman* abstention was not warranted because the defendant failed to show that the statute in question was vague), Plaintiffs do not appear to have standing to assert a vagueness challenge, as discussed above. Furthermore, even if Plaintiffs had standing to attack the alleged vagueness of the Act, this Court cannot conclude that the statute is sufficiently vague, as discussed in more detail below, to warrant abstaining and remanding. Therefore, at this preliminary stage, this Court concludes that there is insufficient justification for it to abstain.

### 4. Whether a Preliminary Injunction Is Warranted

According to the Sixth Circuit,

> When ruling on a motion for a preliminary injunction, a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Memphis Planned Parenthood, Inc. v. Sundquist,* 175 F.3d 456, 460 (6th Cir. 1999); *Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare Corp.,* 110 F.3d 318, 322 (6th Cir.1997). *See Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988); *DeLorean Motor Co. v. DeLorean,* 755 F.2d 1223, 1228 (6th Cir.1985); *Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir.1977). These four considerations "are factors to be balanced, not prerequisites that must be met." *DeLorean,* 755 F.2d at 1229.

### a. Whether Plaintiffs have a strong likelihood of success on the merits

The Court first must examine the strength of Plaintiffs' likelihood of success on the merits of their Complaint. Even if Plaintiffs are unable to show that they are likely to succeed on the merits, however, the Court still may enter a preliminary injunction if the other factors are strongly in Plaintiffs' favor. *See DeLorean,* 755 F.2d at 1229; *In Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 105 (6th Cir.1982); *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537–38 (6th Cir.1978).

Plaintiff has moved for a preliminary injunction based on their void-for-vagueness claim (Count I), their unreasonable searches and seizures claim (Count II), and their denial of prehearing seizure claim (Count III). Therefore, this Court will focus on the strength of Plaintiffs' likelihood of success on the merits of those three claims.

### i. Section 287.1002(p) [Count I]

According to Plaintiffs, Section 287.1002(p) of the Act, which defines the term "wolf-dog cross," is unconstitutionally vague and therefore deprives Plaintiffs of property without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution. Section 287.1002(p) provides as follows:

"Wolf-dog cross" means a canid resulting from the breeding of any of the following:

(i) A wolf with a dog.

(ii) A wolf-dog cross with a wolf.

(iii) A wolf-dog cross with a dog.

(iv) A wolf-dog cross with a wolf-dog cross.

M.C.L. § 287.1002(p). Other subsections define "dog" as "an animal of the species *Canis familiaris* or *Canis lupus familiaris,*" M.C.L. § 287.1002(d), and "wolf" as "an animal of the species *Canis rufus* or *Canis lupus,* but does not include an animal of the species *Canis lupus familiaris,*" M.C.L. § 287.1002(o).

 Even if this Court assumes for the sake of argument that Plaintiffs have standing, this Court concludes that Plaintiffs do not have a strong likelihood of success on the merits of a vagueness challenge. In order to pass constitutional muster, a statute must (1) "define the offense with sufficient definiteness that ordinary people can understand prohibited conduct," and (2) "establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Belle Maer Harbor v. Charter Township of Harrison,* 170 F.3d 553, 556 (6th Cir.1999). In a pre-enforcement challenge, such as this, the principal question is whether the law affords fair warning of what is proscribed. *See Village of Hoffman Estates,* 455 U.S. at 503, 102 S.Ct. 1186.

 Although the Fourteenth Amendment requires adequate notice of unlawful acts, it does not require that the language of a legislative enactment be "mathematically" precise. *See Miller v. California,* 413 U.S. 15, 28, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (absolute "god-like precision" not required by the Constitution); *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Colorado Dog Fanciers, Inc. v. City and County of Denver,* 820 P.2d 644, 651 (Colo. 1991) (en banc). "[F]ew words possess the precision of mathematical symbols, most

statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of government inevitably limit the specificity with which the legislatures can spell out prohibitions." *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952).

 If a statute does not reach constitutionally protected conduct,[5] then a plaintiff asserting a void-for-vagueness claim must show that the statute "is impermissibly vague in all of its applications." *Village of Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. 1186; *see Belle Maer Harbor,* 170 F.3d at 557.[6] Courts have held that the ownership of dogs does not implicate fundamental constitutional rights. *See, e.g., Nicchia v. People of State of New York,* 254 U.S. 228, 230–31, 41 S.Ct. 103, 65 L.Ed. 235 (1920) ("Property in dogs is of an imperfect or qualified nature and they may be subject to peculiar and drastic police regulations by the state without depriving their owners of any federal right."); *Sentell v. New Orleans & C.R. Co.,* 166 U.S. 698, 704, 17 S.Ct. 693, 41 L.Ed. 1169 (1897) ("Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.").

 While the Act does not reach constitutionally protected conduct, it does impose criminal penalties—including incarceration and fines—for its violation. *See*

M.C.L. § 287.1015. "When criminal penalties are at stake, ... a relatively strict test is warranted." *Belle Maer Harbor,* 170 F.3d at 557 (citing *Springfield Armory, Inc.,* 29 F.3d at 252); *see Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

A legislative enactment must give fair warning to those potentially subject to it. *See Village of Hoffman Estates,* 455 U.S. at 501 n. 18, 102 S.Ct. 1186; *American Dog Owners Association, Inc. v. Dade County,* 728 F.Supp. 1533, 1539 (S.D.Fla. 1989). Some courts have found that if the persons who are subject to a statute are an identifiable group with special knowledge of what is being regulated, then the specificity required by due process is measured by the common understanding of the group. *See Fleming v. United States Department of Agriculture,* 713 F.2d 179, 184 (6th Cir.1983); *American Dog Owners Association, Inc.,* 728 F.Supp. at 1539. Here, the Act regulates the dog-owning public, a group with some special knowledge of the matter being regulated, and, therefore, the Act is subject to a less strict standard of review. *See American Dog Owners Association, Inc.,* 728 F.Supp. at 1539.

Similar ordinances regulating allegedly dangerous dog breeds have been upheld against similar vagueness challenges. *See American Dog Owners Association, Inc. v. Dade County,* 728 F.Supp. 1533 (S.D.Fla. 1989) (concluding that an ordinance banning pit bull dogs is not unconstitutionally vague); *Vanater v. Village of South Point,* 717 F.Supp. 1236 (S.D.Ohio 1989) (conclud-

---

**5.** Although most vagueness challenges concern laws that regulate conduct rather than property itself, courts reviewing vagueness challenges frequently have upheld laws, such as the Act, that regulate objects and not conduct. *See State v. Robinson,* 44 Ohio App.3d 128, 541 N.E.2d 1092, 1094–95 (1989) (and cases cited therein); *State v. Peters,* 534 So.2d 760, 767 n. 12 (Fla.Dist.Ct.App.1988) (and cases cited therein).

**6.** In general, void-for-vagueness claims not involving First Amendment freedoms, such as

the instant case, "must be examined in light of the facts of the particular case at hand and not as to the statute's facial validity." *Belle Maer Harbor,* 170 F.3d at 557 (and cases cited therein). Nevertheless, even in cases not involving First Amendment rights, the Sixth Circuit has recognized that "courts may engage in a facial analysis where the enactment imposes criminal sanctions." *Id.* (citing *Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250, 252–54 (6th Cir.1994)).

ing that an ordinance that referred to particular breeds but did not further define them was not unconstitutionally vague, in part because "[a]n ordinary person could easily refer to a dictionary, a dog buyer's guide or any dog book for guidance and instruction"); *Hearn v. City of Overland Park,* 244 Kan. 638, 772 P.2d 758 (1989); *State v. Robinson,* 44 Ohio App.3d 128, 541 N.E.2d 1092 (1989) (concluding that an ordinance regulating dogs "commonly known as pit bull dogs" is not unconstitutionally vague); *Garcia v. Village of Tijeras,* 108 N.M. 116, 767 P.2d 355, 360 (App. 1988) (concluding that an ordinance banning dogs "known as American Pit Bull Terriers" is not unconstitutionally vague); *City of Lima v. McFadden,* No. 1–85–22, 1986 WL 7474 (1986) (upholding ordinance that names but does not otherwise define "pit bull dogs"). *But see People v. Howard,* No. 93–2722, slip op. at 2 (Mich.Dist. Ct. Mar. 18, 1996) (Benson, J.) (dismissing criminal charges brought under the St. Joseph County Animal Ordinance for owning an alleged "wolf-hybrid type animal" in part because the prohibition against possessing a "wild/exotic animal" was unconstitutionally vague).

■ Here, Plaintiffs are not arguing that the definition of a wolf-dog cross itself is vague; rather they are arguing that it is difficult in practice for an ordinary person to determine whether an animal is a wolf, a wolf-dog cross, or a dog. Indeed, Plaintiffs argue that the Act's definition is scientifically insufficient. According to the scientific evidence submitted by Plaintiff, neither appearance nor behavior will serve to distinguish wolf-dog crosses from dogs, and there is no DNA test to distinguish between them. (*See* Pls.Exs. 5–9.) Therefore, Plaintiffs assert, ordinary people cannot understand whether an animal is a wolf, a wolf-dog cross, or a dog.

Defendant responds that dog owners of ordinary intelligence would not find the definition vague. Defendant asserts that dog-owners typically know what sort of dog they own or are seeking to acquire, and it would be unusual for a dog owner to discover that he or she inadvertently owns a wolf-dog cross. Defendant acknowledged that it is difficult for a non-expert to identify traditionally recognized breeds but noted that United States American Wolfdog Association has set forth criteria for distinguishing wolf-dog crosses from dogs and is attempting to standardize an "American Wolfdog" breed. An exhibit submitted by Plaintiffs themselves supports Defendant's contention that there are characteristics that serve to readily distinguish wolf-dog crosses from dogs. (*See* Pls.Ex. 3, Attach. 1.)

The Attorney General points out that Plaintiffs presented no evidence to show that it is impossible to identify a wolf-dog cross. Indeed, Plaintiffs and Plaintiffs' expert, Dr. Raymond Pierotti, can identify wolf-dog crosses, and some even can identify the wolf-content of a wolf-dog cross within one-quarter of a percentage point. (*See* Att'y Gen.Ex. 16 (advertisement affiliated with "Michigan Wolfdog Association Registry" for "high contents to mid/high" wolf-dog crosses showing animals ranging from "73.75%" and "94.75%")).

The Act also provides for pre-enforcement identification of an alleged wolf-dog cross by an expert on wolf-dog cross identification in the event that an owner cannot or will not verify that the animal is a wolf-dog cross.

> If a law enforcement officer believes that a canid is a wolf-dog cross *but the owner of the canid is unable or unwilling to verify that the canid is a wolf-dog cross,* the law enforcement officer, before enforcing this act, shall consult with an expert on wolf-dog cross identification. The expert on wolf-dog cross identification shall consider all relevant aspects of identification, such as behavioral characteristics, and morphological traits, including gait, and any necropsy results.

M.C.L. § 287.1013(3) (emphasis added). Another section defines "expert on wolf-dog cross identification" as "an individual

who has, cumulatively, at least 10 years of training and field experience in wolf and wolf-dog cross behavioral and morphological characteristics and who is recognized as an expert at the state and national levels by others in the same field." M.C.L. § 287.1002(e).

Here, as discussed above, Plaintiffs know that they own wolf-dog crosses and, therefore, they have sufficient notice that their wolf-dog crosses are subject to the Act. Thus, the Act is not constitutionally vague as applied to them, and, therefore, some applications of this portion of the Act are valid. *See American Dog Owners Association, Inc.,* 728 F.Supp. at 1542; *Garcia,* 767 P.2d at 358. Therefore, this Court cannot conclude that the definition of "wolf-dog cross" is facially unconstitutional. Because the definition of "wolf-dog cross" appears to have sufficient definiteness to allow the persons subject to the Act to understand prohibited conduct and appears to provide sufficient guidance to law enforcement, this Court concludes that the void-for-vagueness analysis weighs against Plaintiffs' favor. Even if this Court assumes that Plaintiffs have standing to assert a vagueness challenge, this Court concludes that Plaintiffs are unlikely to succeed on their void-for-vagueness claim for relief.

### ii. Section 287.1013 [Count II]

According to Plaintiffs, Section 287.1013 of the Act permits entry onto private property without a search warrant or probable cause in violation of Plaintiffs' rights against unreasonable searches and seizures under the Fourth Amendment of the U.S. Constitution. Section 287.1013 provides as follows:

(1) A facility is subject to inspection at reasonable hours by a law enforcement officer to ensure compliance with this act.

(2) Subject to subsection (3), if there is probable cause to believe that this act is being violated, a law enforcement officer shall do 1 of the following:

(a) Issue to the violator a notice of the violation under section [287.10]14.

(b) Arrest the violator or seek a warrant for his or her arrest, as appropriate under chapter IV of the code of criminal procedure, 1927 PA 175, M.C.L. § 764.1 to 764.29, for a misdemeanor under section [287.10]15.

(c) File a sworn complaint under section [287.10]16(3).

(3) If a law enforcement officer believes that a canid is a wolf-dog cross but the owner of the canid is unable or unwilling to verify that the canid is a wolf-dog cross, the law enforcement officer, before enforcing this act, shall consult with an expert on wolf-dog cross identification. The expert on wolf-dog cross identification shall consider all relevant aspects of identification, such as behavioral characteristics, and morphological traits, including gait, and any necropsy results. Consultation with an expert on wolf-dog cross identification is not a prerequisite to enforcing this act for a violation of section [287.100]3(1)(d) or (e).

M.C.L. § 287.1013. As noted above, another section defines "expert on wolf-dog cross identification" as "an individual who has, cumulatively, at least 10 years of training and field experience in wolf and wolf-dog cross behavioral and morphological characteristics and who is recognized as an expert at the state and national levels by others in the same field." M.C.L. § 287.1002(e). Section 287.1003(1)(d) and (e), mentioned at the end of subsection (3) above, prohibit transferring, offering to transfer, and receiving ownership or possession of an animal if the person has represented to the transferee that the animal is a wolf-dog cross.

Plaintiffs argue that Section 287.1013 authorizes warrantless searches in and around the homes of alleged owners of wolf-dog crosses and, therefore, it violates the Fourth Amendment. *See, e.g., Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (in general,

searches and seizures of "persons, houses, papers, and effects" without a search warrant are per se unreasonable). Plaintiffs argue, for example, that law enforcement authorities may not conduct a warrantless search of a home, without the home-owner's permission, for a dog suspected of violating leash laws. *See Conway v. Pasadena Humane Society*, 45 Cal.App.4th 163, 171–72, 52 Cal.Rptr.2d 777 (1996).

The Attorney General correctly responds that because Plaintiffs are mounting a facial challenge to the Act, Plaintiffs "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Furthermore, this Court must abide by "the well-established principle that statutes will be interpreted to avoid constitutional difficulties." *See Webster v. Reproductive Health Services*, 492 U.S. 490, 514, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Frisby v. Schultz*, 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

Moreover, Defendant argues that the Supreme Court has carved out a narrow exception to the general warrant requirement for administrative searches in "closely regulated" industries. *See generally New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). An industry is considered closely regulated if there is "a long tradition of close government supervision." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

In *Burger*, the Supreme Court held that a warrantless inspection of a "closely regulated" industry is reasonable when three criteria are satisfied: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspection must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" 482 U.S. at 702–03, 107 S.Ct. 2636 (citations omitted). In order to provide a constitutionally adequate substitute for a warrant, the statute must (a) "advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope" and (b) "limit the discretion of the inspecting officers." *Id.*

In the instant case, the Act falls under Michigan's statutes on "Animal Industry," and animal industry has a long tradition of close government supervision. *See generally* M.C.L. ch. 287. The State of Michigan has a substantial interest in regulating wolf-dog crosses along with other potentially dangerous animals for the protection of the general population.[7] In some circumstances, warrantless inspections may be necessary to further the purposes of the Act. Finally, there is no indication that the Act's inspection program would not provide a constitutionally adequate substitute for a warrant by advising a wolf-dog owner that the search is being made pursuant to the Act and by limiting the discretion of the inspecting officers to search only a "facility"—which is described in some detail in Section 287.1006 and does not include a private home—and only during reasonable hours.

Therefore, on its face, Section 287.1013 does not appear to authorize law enforcement activity that is inconsistent with the requirements of the Fourth Amendment. This Court concludes that Plaintiffs are unlikely to succeed on the merits of their unauthorized searches and seizures claim for relief.

---

7. This Court notes that Michigan also recently passed the Large Carnivore Act, M.C.L. §§ 287.1101–287.1123, which regulates the ownership, possession, and care of lions, tigers, bears, and other large carnivores.

### iii. Sections 287.1016 and 287.1017 [Count III]

According to Plaintiffs, Sections 287.1016 and 287.1017 of the Act provide for the civil forfeiture of wolf-dog crosses without a prior judicial hearing thereby depriving Plaintiffs of property without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution. Section 287.1016 provides as follows:

(1) If a person who owns or possesses a wolf-dog cross violates this act, that wolf-dog cross and any other wolf-dog crosses owned by that person are subject to civil forfeiture.

(2) The prosecuting attorney in an action under section [287.10]15 may file a petition requesting that the court issue an order for civil forfeiture of all of the wolf-dog crosses owned by the person violating this act.

(3) Any person may file with a court having jurisdiction a complaint alleging that a person is violating this act and requesting the court to order the civil forfeiture of all of the wolf-dog crosses owned by that person.

M.C.L. § 287.1016. Section 287.1017 provides as follows:

(1) A law enforcement officer shall seize a wolf-dog cross pursuant to an order of seizure issued by the court having jurisdiction over the wolf-dog cross upon a showing of probable cause that the wolf-dog cross is subject to forfeiture under section [287.10]16(1).

(2) A wolf-dog cross subject to forfeiture under section [287.10]16(1) may be seized under any of the following circumstances:

(a) The seizure is incident to a lawful arrest for a violation of this act.

(b) The seizure is pursuant to a valid search warrant.

(c) The seizure is pursuant to an inspection under a valid administrative inspection warrant.

(d) There is probable cause to believe that the conditions under which the wolf-dog cross or any other wolf-dog cross owned by the same person is kept are directly or indirectly dangerous to human or animal health or safety.

(e) Exigent circumstances exist that preclude obtaining a court order, and there is probable cause to believe that this act has been violated.

(f) The wolf-dog cross or any other wolf-dog cross owned by the same person is the subject of a prior judgment in favor of this state in a forfeiture proceeding.

(3) If a seizure is to be accomplished by capture, tranquilization or other humane methods shall be used for the capture.

(4) A wolf-dog cross seized under this act is not subject to any other action to recover personal property, but is considered to be in the custody of the seizing agency subject only to subsection (5) and sections [287.10]18 and [287.10]19, or to an order and judgment of the court having jurisdiction over the forfeiture proceedings. When a wolf-dog cross is seized under this act, the law enforcement officer may remove the wolf-dog cross to a place designated by the court.

(5) A wolf-dog cross that belongs to the victim of a crime shall promptly be returned to the victim, except in the following circumstances:

(a) When the crime victim last possessed the wolf-dog cross, he or she was in violation of section [287.100]4.

(b) If the ownership of the wolf-dog cross is disputed, until the dispute is resolved.

(c) If the property is required to be retained as evidence pursuant to section 4(4) of the crime victim's rights act, 1985 PA 87, M.C.L. § 780.754.

M.C.L. § 287.1017.

Plaintiffs argue that any prehearing seizure authorized by Sections 287.1016 and 287.1017 is unconstitutional. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Memphis Light, Gas*

*& Division v. Craft,* 436 U.S. 1, 18, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Fuentes v. Shevin,* 407 U.S. 67, 80–84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Gentry v. City of Lee's Summit,* 10 F.3d 1340, 1344 (8th Cir.1993) ("the Supreme Court has generally held that the due process clause requires some kind of a hearing before the state may deprive a person of liberty or property").

The Attorney General responds that Plaintiffs ignore relevant exceptions to this general rule that apply to this case. In particular, in *Fuentes*—which was cited with approval by Plaintiffs—the Supreme Court held that "in limited circumstances, immediate seizure of a property interest, without an opportunity for prior hearing, is constitutionally permissible." *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 678, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (discussing the holding of *Fuentes* ). In particular, prehearing seizures are constitutionally permissible when,

> First, ... the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Fuentes,* 407 U.S. at 91, 92 S.Ct. 1983.

The Attorney General asserts that law enforcement officers are obliged to comply with the general rule and its narrow exception articulated by the Supreme Court and the Act should not be read to contravene this constitutional standard. This Court agrees. Sections 287.1016 and 287.1017 do not appear to be facially infirm, and there is no reason for this Court to conclude that law enforcement officers will not comply with the constitutional standards for prehearing seizures. There-

fore, this Court finds that Plaintiffs are unlikely to succeed on the merits of their prehearing seizure claim for relief.

Accordingly, this Court concludes that Plaintiffs do not have a strong likelihood of success on the merits of Counts I, II, and III.

**b. Whether Plaintiffs would suffer irreparable injury without the injunction**

■ In order to obtain a preliminary injunction, the harm to Plaintiffs that would result in the absence of the injunction must be irreparable, not merely substantial. *See Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). A moving party's harm is irreparable if monetary damages are difficult to calculate or will not adequately compensate for the injury. *See Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992).

■ Among other requirements, the Act requires that all wolf-dog crosses be sexually sterilized. *See* M.C.L. § 287.1004(3)(c). The Act requires owners to have a microchip implanted in their wolf-dog cross. *See* M.C.L § 287.1005. The Act prohibits transferring ownership of wolf-dog crosses. *See* M.C.L. § 287.1003(1). The Act requires owners to construct elaborate facilities, with certain specifications, for housing wolf-dog crosses. *See* M.C.L. § 287.1006. Hence, because some owners cannot afford to construct the facilities and because they are prohibited from transferring ownership, Plaintiffs argue that these requirements ultimately will result in harm to the animals in question.

Plaintiffs argue that they would be irreparably injured because the Act also requires that a wolf-dog cross be humanely euthanized under limited circumstances, such as if it potentially exposes a human or other animal to rabies or if it kills or injures a human or other animal. *See* M.C.L. §§ 287.1010, 287.1020. The Act,

however, does not appear to require destruction of wolf-dogs under conditions that differ significantly from those that already apply to the destruction of dogs. *See* M.C.L. §§ 287.277 – 287.280.

Sexual sterilization would cause irreparable harm, at least to the animals. The other requirements, such as implantation of a microchip and construction of a facility, however, do not appear to cause irreparable harm because Plaintiffs could be compensated by Defendant if the Act were declared unconstitutional. This Court finds that in the absence of a preliminary injunction, the only irreparable harm would be the sexual sterilization of Plaintiffs' animals, but in light of the other factors the Court must consider and balance, this harm may not be sufficient to justify entering a preliminary injunction.

**c. Whether issuance of the injunction would cause substantial harm to others**

Plaintiffs argue that issuance of the injunction would not cause substantial harm to others because any problems posed by wolf-dog crosses can be addressed under Michigan's Dog Law of 1919, M.C.L. §§ 287.261 – 287.290, and related statutes. For example, the Dog Law of 1919 mandates licensing and includes a leash requirement. *See* M.C.L. § 287.262. Michigan law also provides for confinement or destruction of a dog that has injured or bitten a person or destroyed property. *See* M.C.L. § 287.279. Furthermore, Plaintiffs argue that wolf-dog crosses are less likely to harm humans than non-hybrid dogs because humans are more often bitten by non-hybrid dogs. (*See* Pls.Exs. 16, 17.)

As the Attorney General points out, both of these arguments are flawed. First, licensing and leash laws will do little to control the animals subject to the Act; the Michigan legislature would not have bothered enacting stringent requirements of the Act if it considered the licensing and leash laws to be an adequate control of wolf-dog crosses.

Second, Plaintiffs' statistics on the frequency of dog bites are suspicious because they do not take into account the very real possibility that the reason why wolf-dog crosses account for fewer fatal bites than other breeds is that there are far fewer of them than other breeds. Indeed, Plaintiffs' own exhibit shows the difficulty of calculating a breed-specific dog bite-related fatality rate because there is no reliable breed-specific population data. (*See* Pls.Ex. 16 at 838.) At oral argument, Plaintiffs' counsel agreed with the Court's conclusion one could not infer from these statistics that wolf-dog crosses are less dangerous than non-hybrid dogs.

Plaintiffs themselves submitted an exhibit which shows that wolf-dog crosses potentially are dangerous. (Pls.Ex.3, Attach.1.) An attachment to the affidavit submitted by the President of the Michigan Wolfdog Association, Jane Van Scoik, entitled "Wolf Park's position on people keeping wolves and wolf-dog hybrids as pets," states, in part, as follows:

1. Wolves and high wolf content hybrids should never be regarded as pets. If kept in captivity, whether in zoos, wildlife parks, or by private persons, they should be maintained so as to meet certain minimum standards in keeping with their psychological and physical well-being.

 a. The wolves should be hand-raised from before the age of 14 days (no later than 21 days), to insure that they are properly socialized to people....

 b. There should be at least two animals raised together. Being highly social animals, they need companions of their own species. Wolves and hybrids raised in isolation from their own kind often display a variety of behavioral problems and abnormalities.

 c. They should be housed in large 8′ high + overhang & skirting, 11 gage or equivalent, chain link enclosures with a minimum of 1600 sq. ft. of floor space

and fed a proper meat diet, including bones, skin, and/or fur....

d. The human caretakers should make a commitment to the animals for the entire life span of the animals....

e. The attending veterinarian should be familiar with the proper handling of wolves....

f. Prospective owners of wolves or hybrids in captivity should first obtain any necessary permits....

g. The prospective owners should review the pertinent literature on the behavior and ecology of wolves and speak to as many wolf owners as possible....

2. Adequate facilities, which are expensive, should be ready when the animals arrive. Neighbors should be consulted *prior* to the acquisition of the animals. Wolves should *never* be kept in a city, town, or housing development. THEY SHOULD NEVER BE KEPT ON A CHAIN IN A YARD. Children below the age or size of a typical 14–year–old, including the owner's, are always potentially in danger.

3. Wolf-dog hybrids should, for safety reasons, essentially be kept like wolves as outlined above. While low percentage wolf-dog hybrids may be unlike pure wolves in many respects, and many can and are kept like pure dogs, they all retain, as do many dogs, the motivation for predatory behavior. This means that a person, especially a child who tripped and fell, or who is moaning, crying, or screaming, may be considered wounded prey, and be attacked. Grave injuries, even death, are all too frequent in such instances.

The socialized wolves or wolf-dog hybrids may also challenge the owner or others for dominance. This, too, can result in serious injury to the persons involved. Tame wolves or wolf-dog hybrids may also defend their food against people, especially children. A mere defensive bite can result in serious injuries, even though the animal "meant" no harm....

4. The proper conditions for maintaining wolves or wolf-dog hybrids safely in captivity are often not met. With respect to the psychological well-being of wolves, even many zoos do not meet optimal conditions for proper handling and care....

(Pls.Ex. 3, Attach. 1 (emphasis in original).)

This Court finds that enjoining Defendant from enforcing the Act would expose the general population to the threat of harm that the Act was designed to prevent. Therefore, this Court concludes that this factor weighs against Plaintiffs' favor.

### d. Whether the public interest would be served by issuance of the injunction

Plaintiffs argue that the public interest would be served by enjoining enforcement of the Act until the Court has the opportunity to rule on the merits of Plaintiffs' claims because the owners of wolf-dog crosses would not have to expend considerable resources and irreparably alter their animals until such time as the Court can fully consider the constitutionality of the Act.

As the Attorney General points out, the public interest also includes protecting the public from any harm posed by wolf-dog crosses. The potential for serious harm to the public, as demonstrated by the deaths and injuries that have resulted from wolf-dog cross attacks, is what necessitated the enactment of the Act in the first place.

This Court concludes that, in light of the evidence of the risk of serious harm that wolf-dog crosses pose to the general population, the public interest would be served best by not preliminarily enjoining the enforcement of the Act. Thus, the public interest weighs against granting the preliminary injunction that Plaintiffs request.

### Conclusion

After reviewing the factors that this Court must consider and balance when

ruling on a motion for a preliminary injunction, this Court concludes that those factors militate against granting preliminary injunctive relief.

Accordingly, this Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that the Michigan Attorney General's Motion to Intervene [Docket Entry 11] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order [Docket Entry 2], which this Court considers to be a motion for a preliminary injunction, is **DENIED.**

**SO ORDERED.**